—— A.2d ——

**STATE of Maryland**

v.

**Dennis Lamont LUCAS.**

**No. 30, Sept. Term, 2008.**

Court of Appeals of Maryland.

Feb. 19, 2009.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Petitioner.

Brian M. Saccenti, Asst. Public Defender (Nancy S. Forster, Public Defender), on brief, for Respondent.

Argued before Bell, C.J. HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and JOHN C. ELDRIDGE, (Retired, Specially Assigned) JJ.

ADKINS, J.

We are asked to decide whether responsive statements made by a visibly upset woman, while standing in her apartment doorway, to a police officer responding to a "domestic" call, were testimonial and therefore inadmissible under the Sixth Amendment's Confrontation Clause. These statements were made in response to the officer asking her "what happened" and "where she got the marks[.]" These statements were admitted at the bench trial in the Circuit Court for Anne Arundel County which resulted in the conviction of Dennis Lamont Lucas, respondent, for second degree assault.[1] The State appeals from the judgment of the Court of Special Appeals reversing that conviction on the ground that respondent's constitutional rights were violated.

Lucas was alleged to have assaulted his girlfriend during a domestic dispute. Lucas moved *in limine* to exclude the victim's statements made to police officers who responded to the "domestic" call, contending that the statements' admission would violate his right of confrontation under the Sixth Amendment and the Maryland Declaration of Rights. Satisfied that the statements were admissible as an excited utterance and allowable under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Circuit Court denied Lucas's motion. The Court of Special Appeals, in an unreported opinion, reversed and remanded for a new trial,

---

1. Lucas was sentenced to a three-year term of imprisonment, with all but ninety days suspended, and placed on probation for five years.

concluding that the statements were made under official inter-
rogation, an obvious substitute for live testimony, and admit-
ted in violation of Lucas's right to confront his accuser:

> There was no emergency in progress; [the alleged victim]
> was in no present danger from [Lucas]; she was being
> protected by the police; she was actively separated from
> [Lucas]; she was telling what happened in the past, not the
> present; and the interrogation was part of an investigation
> into possibly criminal past conduct.

We issued a writ of certiorari to review the statements under
*Crawford* and its progeny. We agree with the intermediate
appellate court that the statements were testimonial because
the primary purpose of the interrogation was to investigate a
possible crime, and not to enable the officers to meet an
ongoing emergency.

## FACTS AND LEGAL PROCEEDINGS

On January 25, 2005, at approximately 11:00 p.m., Anne
Arundel County Police Officer Wilbert Fowler received a
"[d]omestic call." Fowler and Officer Dalton responded to 412
Pamela Road, Apartment B, in Glen Burnie a couple of
minutes after receiving the call. Upon their arrival at the
residence, Fowler observed Lucas sitting on some steps out-
side of the apartment. Fowler descended four or five stairs in
getting to Apartment B, which was located in the lower level
of the apartment building. Dalton stayed with Lucas outside
of the apartment. Fowler encountered Emily Mulligan, the
alleged victim, at her apartment "threshold" and observed that
she was crying, her face was pretty red, her "eyes were kind
of swollen and she had red marks on her neck."

Fowler testified that he then questioned Mulligan "about
why [they] were called to the residence and why she was
crying." According to Fowler, Mulligan responded that she
and Lucas, her boyfriend, "were in a verbal argument" about
"breaking up" and "that it became physical after that." Fowl-
er testified that she told him she was "kicked in the leg" by
Lucas and that "he grabbed her around the neck." She also

told Fowler she sustained an abrasion or laceration on her back. Fowler did not have Mulligan sit down during the conversation. When asked by counsel "[w]hat if any rights did you advise her of[,]" Fowler responded, "I told her we were there for an investigation." He estimated that the conversation lasted "[m]aybe three to five minutes." In describing Mulligan's demeanor during this period, he said, "She was visibly upset. She was still crying. Very shaky." Fowler indicated that he asked Mulligan "[m]aybe one or two" questions and "kind of let her do the talking."

On cross-examination, Fowler agreed that his "purpose in speaking with Ms. Mulligan or knocking on the door and speaking with the occupants was to conduct an investigation" and that he was "there to gather information." He indicated that Mulligan filled out a "domestic violence form" while at the apartment and that he "went over it" with her. Mulligan was also photographed approximately 15 to 20 minutes after Fowler's initial conversation at the apartment. On redirect, Fowler stated that his initial questions to Mulligan were "why we were there, what happened" and "where she got the marks from[.]"

Fowler indicated that Officer Robey arrived on the scene after Mulligan told him about the marks. Fowler relayed to Robey what Mulligan had told him. He then went outside to join Lucas and Officer Dalton while Robey spoke with Mulligan for approximately five minutes. When Robey came out of the apartment and said something to Lucas, Lucas "[s]pun around and ran[,]" and the two officers pursued Lucas on foot. Lucas ran "right around the building, basically right to where the chase started[.]" Robey cornered him and Lucas surrendered, saying, "'you got me. I'm cold and I'm tired.'"

Defense counsel moved *in limine* to exclude Mulligan's out-of-court statements to the police officers. The court denied the motion and immediately proceeded to the trial on the merits. With the consent of counsel for both parties, the court agreed to accept Fowler's testimony given during the

motion *in limine* hearing as if it were given during the merits trial.

Mulligan was not present in court on the day of trial. Fowler testified that he did not know where she was and that the State never asked him to go find her.

Lucas testified in his own defense. Lucas testified that Mulligan was his girlfriend and that they had an argument when she accused him of cheating on her. According to Lucas, Mulligan told him to leave. When he went to get his things, Mulligan ran at him and knocked him down. Lucas then got back up and pushed Mulligan off of him. He denied that he grabbed Mulligan around the neck, but indicated that "when [he] pushed her it was the upper part of her chest." Lucas then "got [his] stuff and went out in the hallway and [sat] on the steps." Lucas said that he could not leave because his car keys were in the apartment and that he sat outside "a good 15 to 20 minutes" before the police arrived. He testified that he ran from the police "[b]ecause [he] didn't believe [he] was getting locked up on some, —— bull crap."

## DISCUSSION

The State contends that the Court of Special Appeals erred in reversing Lucas's conviction and ordering a new trial because the admission of Mulligan's statements into evidence did not violate his rights under the Confrontation Clause.

The Confrontation Clause of the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause barred the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." In holding that the provision barred the admission of "testimonial" statements, the Supreme Court "fundamentally altered its Confrontation Clause jurisprudence[.]" *State v. Snowden,*

385 Md. 64, 78, 867 A.2d 314, 322 (2005). It did so upon recognizing that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford,* 541 U.S. at 50, 124 S.Ct. at 1363.

Before *Crawford,* an out-of-court statement's admissibility turned on whether the unavailable witness' statement has "adequate indicia of reliability—*i.e.,* falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford,* 541 U.S. at 42, 124 S.Ct. at 1359 (citing *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). The *Crawford* Court rejected the *Roberts* test because it departed from the historical principles underlying the Confrontation Clause in two respects:

> First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability.

*Id.* at 60, 124 S.Ct. at 1369.

In *Snowden,* we reviewed the *Crawford* Court's abrogation of *Roberts:*

> The Supreme Court found fault with the perceived unpredictability and subjectivity of the "indicia of reliability" test in *Roberts.* In overruling *Roberts,* the Court stated:

>> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of

reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. 385 Md. at 79, 867 A.2d at 322 (quoting *Crawford,* 541 U.S. at 61, 124 S.Ct. at 1370).

The *Crawford* Court declined to "spell out a comprehensive definition of 'testimonial[,]' " leaving that effort "for another day[.]" 541 U.S. at 68, 124 S.Ct. at 1374. It indicated, however, that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court held, moreover, that the statements at issue in *Crawford,* recorded and "knowingly given in response to structured police questioning," qualified as testimonial "under any conceivable definition." *Id.* at 53 n. 4, 124 S.Ct. at 1365 n. 4.

The *Crawford* Court provided characteristics of a testimonial statement and we reviewed these characteristics in *Snowden:*

The *[Crawford]* Court began by addressing what is "testimony":

> "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

Rather than articulate a singular standard, the Court offered three proposed formulations to exhibit the "core class" of what is "testimonial" for Confrontation Clause purposes:

> "[1] ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," [2] "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"; [3] "statements that were made under circumstances which would lead an objective

witness reasonably to believe that the statement would be available for use at a later trial."

385 Md. at 80–81, 867 A.2d at 323–24 (quoting *Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364 (citations omitted)). We observed the common nucleus shared by each of the above formulations and the uniting theme underlying the *Crawford* holding:

> As the Court noted, these standards share a common nucleus in that each involves a formal or official statement made or elicited with the purpose of being introduced at a criminal trial. . . . Although these standards focus on the objective quality of the statement made, the uniting theme underlying the *Crawford* holding is that when a statement is made in the course of a criminal investigation initiated by the government, the Confrontation Clause forbids its introduction unless the defendant has had an opportunity to cross-examine the declarant.

*Id.* at 81, 867 A.2d at 324 (citing *Crawford,* 541 U.S. at 52, 56 n. 7, 124 S.Ct. at 1364, 1367 n. 7).

The Supreme Court elaborated on its definition of testimonial in the context of statements made during police interrogations in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court consolidated two cases, *Davis v. Washington,* an appeal from the Supreme Court of Washington, and *Hammon v. Indiana,* an appeal from the Indiana Supreme Court, to "determine when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial[.]' " *Id.* at 817, 819, 821, 126 S.Ct. at 2270, 2271–72, 2273. The Court observed that in *Crawford,* it set forth " '[v]arious formulations' of the core class of 'testimonial' statements" and that among these "were' [s]tatements taken by police officers in the course of interrogations[.]' " *Id.* at 822, 126 S.Ct. at 2273 (citing *Crawford,* 541 U.S. at 52, 53, 124 S.Ct. at 1354)(internal quotation marks omitted). Acknowledging that it did not define the term " 'interrogation[,]' " the Court recognized that it had to "determine more precisely which police interrogations produce testimony." *Id.* The Court then

formulated the following rubric for classifying statements in response to police interrogation:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis,* 547 U.S. at 822, 126 S.Ct. at 2273–74 (footnote omitted).

The Supreme Court applied this rubric to the two consolidated cases on appeal. It began by analyzing the interrogation at issue in the Washington case and concluded that it did not produce testimonial statements. In *Davis v. Washington,* the defendant, Adrian Davis, was convicted of violating a domestic no-contact order. The complainant, Michelle McCottry, called a 911 emergency operator, and the operator answered, but the connection terminated before McCottry spoke. The 911 operator reversed the call and McCottry answered. The following exchange ensued:

"911 Operator: Hello.

"Complainant: Hello.

"911 Operator: What's going on?

"Complainant: He's here jumpin' on me again.

"911 Operator: Okay. Listen to me carefully. Are you in a house or an apartment?

"Complainant: I'm in a house.

"911 Operator: Are there any weapons?

"Complainant: No. He's usin' his fists.

"911 Operator: Okay. Has he been drinking?

"Complainant: No.

"911 Operator: Okay, sweetie. I've got help started. Stay on the line with me, okay?

"Complainant: I'm on the line.

"911 Operator: Listen to me carefully. Do you know his last name?

"Complainant: It's Davis.

"911 Operator: Davis? Okay, what's his first name?

"Complainant: Adrian

"911 Operator: What is it?

"Complainant: Adrian.

"911 Operator: Adrian?

"Complainant: Yeah.

"911 Operator: Okay. What's his middle initial?

"Complainant: Martell. He's runnin' now."

*Id.* at 817–18, 126 S.Ct. at 2271 (citation omitted).[2] The police arrived within four minutes of the call. McCottry was in a "shaken state," had " 'fresh injuries on her forearm and her face,' " and was engaging in " 'frantic efforts to gather her belongings and her children so that they could leave the residence.' " *Id.* at 818, 126 S.Ct. at 2271 (citations omitted).

---

**2.** The 911 operator gathered additional information from the call:

[T]he operator learned that Davis had "just r[un] out the door" after hitting McCottry, and that he was leaving in a car with someone else. McCottry started talking, but the operator cut her off, saying, "Stop talking and answer my questions." She then gathered more information about Davis (including his birthday), and learned that Davis had told McCottry that his purpose in coming to the house was "to get his stuff," since McCottry was moving. McCottry described the context of the assault, after which the operator told her that the police were on their way. "They're gonna check the area for him first," the operator said, "and then they're gonna come talk to you."

*Davis v. Washington,* 547 U.S. 813, 818, 126 S.Ct. 2266, 2271, 165 L.Ed.2d 224(2006) (citations omitted). The Supreme Court, however, was not asked to determine whether the additional statements above were testimonial:

Davis's jury did not hear the *complete* 911 call, although it may well have heard some testimonial portions. We were asked to classify only McCottry's early statements identifying Davis as her assailant, and we agree with the Washington Supreme Court that they were not testimonial. That court also concluded that, even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt. Davis does not challenge that holding, and we therefore assume it to be correct.

*Id.* at 829, 126 S.Ct. at 2277–78.

The Court concluded that "the circumstances of McCottry's interrogation objectively indicat[ed] its primary purpose was to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 828, 126 S.Ct. at 2277. The Court observed, first, that "the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827, 126 S.Ct. at 2276. The Court then distinguished McCottry's interrogation responses from the testimonial statements in *Crawford*:

> The difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis*, McCottry was speaking about events *as they were actually happening,* rather than "describ[ing] past events[.]" Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered in *Davis,* again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

*Id.,* 126 S.Ct. at 2276–77 (citations omitted, emphasis in original). McCottry's statements did not violate Davis's right of confrontation because "[s]he simply was not acting as a *witness;* she was not *testifying.* What she said was not 'a weaker substitute for live testimony' at trial[.]" *Id.* at 828, 126 S.Ct. at 2277 (citation omitted, emphasis in original).[3]

The Court then analyzed the statements at issue in the second case, *Hammon v. Indiana,* and held that they were testimonial. Unlike the Washington case, the task of "[d]etermining the testimonial or nontestimonial character of the statements" in *Hammon* was much easier because "they were not much different from the statements [the Court] found to be testimonial in *Crawford.*" *Davis,* 547 U.S. at 829, 126 S.Ct. at 2278. In *Hammon,* police officers responded late one evening "to a 'reported domestic disturbance' at the home of Herschel and Amy Hammon." *Id.* at 819, 126 S.Ct. at 2272 (citation omitted). The Court recounted the facts as follows:

[The officers] found Amy alone on the front porch, appearing " 'somewhat frightened,' " but she told them that " 'nothing was the matter[.]' " She gave them permission to enter

---

**3.** The Court indicated in dicta that a conversation "which [began] as an interrogation to determine the need for emergency assistance" could " 'evolve into testimonial statements' ... once that purpose has been achieved." *Davis,* 547 U.S. at 828, 126 S.Ct. at 2277 (citation omitted). It explained:

In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford,* [541 U.S. at 53 n. 4, 124 S.Ct. at 1365 n. 4]. This presents no great problem. Just as, for Fifth Amendment purposes, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect," *New York v. Quarles,* 467 U.S. 649, 658–659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial.

*Id.* at 828–29, 126 S.Ct. at 2277.

the house, where an officer saw "a gas heating unit in the corner of the living room" that had "flames coming out of the . . . partial glass front. There were pieces of glass on the ground in front of it and there was flame emitting from the front of the heating unit."

Hershel, meanwhile, was in the kitchen. He told the police "that he and his wife had 'been in an argument' but 'everything was fine now' and the argument 'never became physical.' " By this point Amy had come back inside. One of the officers remained with Hershel; the other went to the living room to talk with Amy, and "again asked [her] what had occurred." Hershel made several attempts to participate in Amy's conversation with the police, but was rebuffed. The officer later testified that Hershel "became angry when I insisted that [he] stay separated from Mrs. Hammon so that we can investigate what had happened." After hearing Amy's account, the officer "had her fill out and sign a battery affidavit." Amy handwrote the following: "Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter."

*Id.* at 819–20, 126 S.Ct. at 2272 (citations omitted). Hershel was charged with domestic battery and violation of his probation. When Amy was subpeonaed to testify at Hershel's bench trial and failed to appear, the trial court permitted the interviewing officer to testify about Amy's statements, ruling that the statements were admissible as " 'excited utterances' that 'are expressly permitted in these kinds of cases even if the declarant is not available to testify.' " *Id.* at 820, 126 S.Ct. at 2272 (citation omitted).

The Supreme Court held that Amy Hammon's statements were testimonial:

It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged. There was no emergency in progress; the interrogating officer testified that he had heard no argu-

ments or crashing and saw no one throw or break anything. When the officers first arrived, Amy told them that things were fine and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.

*Id.* at 829–30, 126 S.Ct. at 2278 (citations omitted, emphasis in original). The Court acknowledged that the interrogation in Crawford was more formal: "[i]t followed a Miranda warning, was tape-recorded, and took place at the station house[.]" *Id.* at 830, 126 S.Ct. at 2278. But Amy's interrogation was "formal enough" to elicit testimonial statements, because it was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his " 'investigat[ion].' " *Id.* (citation omitted).

The Court regarded Amy's statement as resembling the testimonial statement in *Crawford* and inherently testimonial:

Both declarants were actively separated from the defendant—officers forcibly prevented Hershel from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Davis*, 547 U.S. at 830, 126 S.Ct. at 2278 (citation and footnote omitted, emphasis in original). Distinguishing the statements in *Hammon* from the ones at issue in *Davis v. Washington*, the Court said:

The statements in *Davis* were taken when McCottry was alone, not only unprotected by police (as Amy Hammon was

protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry's present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described. And after Amy answered the officer's questions, he had her execute an affidavit, in order, he testified, "[t]o establish events that have occurred previously."

*Id.* at 831–32, 126 S.Ct. at 2279 (citation omitted). The *Davis* Court "reject[ed] the . . . implication that virtually any 'initial inquiries' at the crime scene will not be testimonial[.]" *Id.* at 832, 126 S.Ct. at 2279 (citation omitted). It did not, however, "hold the opposite—that no questions at the scene will yield nontestimonial answers." *Id.* (emphasis in original). The Court explained:

We have already observed of domestic disputes that "[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." Such exigencies may *often* mean that "initial inquiries" produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial.

*Id.* (citations omitted, emphasis in original).

The State contends here that Mulligan's statements made in response to Officer Fowler's questions at the entrance to her apartment were nontestimonial because the questions' primary purpose was to enable the police to meet an ongoing emergency and not to establish or prove past events potentially relevant to later criminal prosecution. The State asserts that this case "is much closer to *Davis* than it is to *Hammon.*" It argues that the police had not yet taken control of the situation when they first encountered Mulligan at the threshold of her apartment. The State maintains that "the police

knew very little when they responded to [the] 'domestic' call at 11:00 p.m., including whether or not the suspect was still inside the apartment."

The State points to Mulligan's physical appearance at the scene, the timing of the officers' arrival, and the nature of Fowler's questioning to distinguish this case from *Hammon*. Fowler indicated that Mulligan was "crying[,]" "visibly up-set[,]" and "[v]ery shaky." Her face was "pretty red" and she had eyes that were "kind of swollen" and "red marks on her neck." In contrast, the *Hammon* victim appeared "somewhat frightened" and told the responding officers that "nothing was the matter[.]" *See id.* at 819, 126 S.Ct. at 2272 (internal quotation marks omitted). Fowler also stated that they arrived "a couple of minutes" after receiving the domestic call and asked Mulligan "about why [they] were called to the residence and why she was crying." In *Hammon*, however, the victim's statement "was delivered at some remove in time from the danger ... described." *See id.* at 832, 126 S.Ct. at 2279.

The State highlights Fowler's testimony that he asked "[m]aybe one or two" questions and "kind of let [Mulligan] do the talking" to argue that Fowler's questions were "[u]nlike the structured questioning in both *Crawford* and *Hammon[.]* " It asserts that the questioning here is unlike the "formal enough" interrogation in *Hammon*, because there is no indication that the officers deliberately separated Mulligan and Lucas to obtain incriminating statements. *See id.* at 830, 126 S.Ct. at 2278. The State asserts, moreover, that Fowler's questioning is distinct from the *Hammon* interrogation, because Fowler was not taking notes or filling out a police report during his conversation with Mulligan.

The State acknowledges that Officer Fowler's questions, "what happened" and "where she got the marks[,]" were phrased in the past tense. It argues, though, that "the test to determine whether a response is testimonial cannot be based solely on the grammatical phrasing of the question." *See State v. Ohlson*, 162 Wash.2d 1, 168 P.3d 1273, 1279 (2007)(re-

jecting a "simple grammatical analysis" of "whether a statement is 'in the past or present tense'" for determining a statement's testimonial or nontestimonial nature and concluding that "*Davis* supports a more nuanced approach" in evaluating "initial inquires at a crime scene"). *See also Long v. United States*, 940 A.2d 87, 96 (D.C.2007)(rejecting an argument "that under *Crawford* any statement made to a police officer that another person has committed or is committing a crime is inherently 'testimonial' because of its accusatory nature, regardless of the circumstances under which the statement was made" and concluding, from *Davis*, that "*Crawford* cannot be read in such absolute terms").

Our task is to determine whether the circumstances of Officer Fowler's interrogation of Mulligan objectively indicate that its primary purpose was "to enable police assistance to meet an ongoing emergency[,]" *see Davis*, 547 U.S. at 822, 126 S.Ct. at 2273, and we agree that this test requires more than a simple grammatical analysis of Fowler's questions. The *Davis* Court considered a number of factors in analyzing the primary purpose of the interrogations at issue, including (1) the timing of the statements, *i.e.* whether the declarant was speaking about actually happening or past events; (2) whether the "reasonable listener would recognize that [the declarant] . . . was facing an ongoing emergency"; (3) the nature of what was asked and answered, *i.e.* whether the statements were necessary to resolve the present emergency or simply to learn what had happened in the past; and (4) the interview's level of formality. *See id.* at 827, 126 S.Ct. at 2276–77. In assessing formality, relevant measures included the interview's location; whether the declarant was actively separated from the defendant; whether "the officer receiv[ed] [the declarant's] replies for use in his 'investigat[ion]'"; and whether the statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *See id.* at 830, 126 S.Ct. at 2278 (citation omitted).

Having considered these factors, we conclude that the circumstances of Fowler's interrogation objectively indicate a primary purpose to "establish or prove past events potentially

relevant to later criminal prosecution" and not to "enable police assistance to meet an ongoing emergency." *See id.* at 822, 126 S.Ct. at 2273–74. The emergency had ended when Fowler encountered Mulligan at the door of her apartment. When Fowler questioned Mulligan about "what happened" and "where she got the marks[,]" Mulligan spoke of past events: she and Lucas were in an argument that "became physical[,]" that she was "kicked in the leg" by Lucas, and that "he grabbed her around the neck." A reasonable listener would recognize that Mulligan's emergency had ceased. The officers, upon arrival, observed Lucas sitting on some steps outside of the apartment and Dalton stayed with him while Fowler spoke with Mulligan. As in *Hammon* and unlike *Davis*, Mulligan was protected by the police and no longer under any apparent imminent danger when she spoke with Fowler.

Fowler observed that Mulligan was crying and visibly upset and had a red face, eyes that were "kind of swollen[,]" and "red marks on her neck." He did not indicate, however, that he heard arguments or crashing or saw anyone throw or break anything inside the apartment. Thus, Fowler did not observe or detect anything suggesting that there was another potential assailant inside the apartment. Having already encountered Lucas outside of Mulligan's apartment, Fowler's initial inquires were not necessary to "know whom they [were] dealing with in order to assess the situation, the threat to their own safety, and possible danger to" Mulligan. *See Davis,* 547 U.S. at 832, 126 S.Ct. at 2279.

The circumstances here are distinct from those in which officers encountered victims with apparent severe injuries requiring immediate medical attention and/or where an assailant had not yet been located. *See, e.g., Anderson v. State,* 163 P.3d 1000, 1004 (Alaska Ct.App.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1486, 170 L.Ed.2d 306 (2008)(concluding that the primary focus of an officer's question—"What happened?"—was to "sort out an ongoing emergency situation" after officers encountered the victim lying in a fetal position, shirtless, with bruises on his torso, and when the victim told

the officers that he was hurt and having a hard time breathing; the officer sought the assistance of paramedics after encountering the victim); *Lewis v. United States,* 938 A.2d 771, 773–74, 781 (D.C.2007)(finding an ongoing emergency where an officer asked the victim "what had happened, and who had done this" after discovering the victim in the front seat of a vehicle with " 'a large amount of blood on her shirt' and . . . 'bleeding from the head and face area' as the result of 'multiple lacerations[,]' ? " and observing the defendant walking away from the car; the "situation was uncertain and confused[,]" the officer was "unaccompanied by other officers, [and] had no way of knowing whether [the defendant] was the assailant or whether he might be armed"; the officer asked for an ambulance after encountering the victim); *People v. Bradley,* 8 N.Y.3d 124, 830 N.Y.S.2d 1, 862 N.E.2d 79, 80–81 (2006)(holding a victim's responses to an officer's question "what happened" to be non-testimonial after the officer, before having located the attacker, observed the victim at the door of her apartment with blood on her face and clothing, bleeding "profusely" from one hand, and walking with a noticeable limp; the purpose of the interrogation was to determine the cause of the injuries to "decide what, if any, action was necessary to prevent further harm").

Unlike two of the preceding cases, although Mulligan was visibly upset and exhibited injuries, there is no indication in the record that the officers administered or called for emergency medical assistance upon observing her condition. The officers proceeded to photograph Mulligan, complete a domestic violence form, and review the form with Mulligan at her apartment.

Fowler's questioning of Mulligan, admittedly, was less formal than the tape-recorded police station interrogation in *Crawford.* But like the testimonial statement-producing interrogation in *Hammon,* Fowler's interrogation was "formal enough" to elicit testimonial statements: Fowler questioned Mulligan while Dalton remained with Lucas; Fowler told Mulligan that they were "there for an investigation"; and

Mulligan recounted, in response to Fowler's questions, how Lucas kicked her and grabbed her around the neck.

## Conclusion

When Officer Fowler asked Mulligan "what happened" and "where she got the marks" at the door of her apartment in response to a "domestic" call, the interrogation's primary purpose was to establish or prove past events potentially relevant to later criminal prosecution and not to enable police assistance to meet an ongoing emergency. Mulligan's statements that Lucas had kicked her and grabbed her around the neck were testimonial because she spoke of past events, was protected by the police from Lucas, and no longer under any imminent danger. In asking Mulligan "what happened" and "where she got the marks[,]" Fowler investigated a possible crime, which is precisely what he should have done. But Mulligan's statements were an impermissible substitute for live testimony, and their admission through Fowler's testimony violated Lucas's confrontation rights under *Crawford* and *Davis*.[4] Accordingly, the judgment of the Court of Special Appeals reversing the conviction and ordering a new trial is affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.**

---

4. The State does not argue harmless error.