45 So.3d 470 (2010)
Henry MARSHALL, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D07-489.
District Court of Appeal of Florida, Third District.
January 20, 2010.
Opinion Denying Rehearing and Rehearing En Banc October 27, 2010.
Bennett H. Brummer, Public Defender, and Robert Kalter, Assistant Public Defender, for appellant.
Bill McCollum, Attorney General, and Nicole Hiciano, Assistant Attorney General, for appellee.
Before SHEPHERD, CORTIÑAS, and SALTER, JJ.
PER CURIAM.
Affirmed. See U.S. v. Proctor, 505 F.3d 366 (5th Cir.2007).
CORTIÑAS and SALTER, JJ., concur.
SHEPHERD, J., dissenting.
Henry Marshall challenges his conviction for armed robbery on the ground the only evidence offered to prove he was armed was hearsay evidence, admitted over his objection in violation of the Confrontation Clause of both the United States and Florida Constitutions. See Amend. VI, U.S. Const.; Art. I, § 16, Fla. Const. For the reasons set forth below, I find Marshall's argument to have merit and would reverse the conviction.

FACTUAL AND PROCEDURAL BACKGROUND
Marshall's conviction arises out of the robbery of Leon Valentine by Marshall and two confederates, in broad daylight, on the side of a residential street in the Buena Vista subdivision, located in the City of Miami. Valentine had just pulled over to make a business call on his cellular telephone. After rifling through the passenger cab and trunk of Valentine's vehicle and taking Valentine's jewelry, the robbers sped off in the car in which they arrived with their loot and the victim's house and car keys. Although naturally shaken by the incident, Valentine was physically unharmed.
There were two witnesses to the crime. The first, Leshan Davis, was alerted to the scene during the course of the crime by a bicycle passerby. The second, Marcia Manker, witnessed the entire episode from the kitchen window of her house, which faced onto the street.
The robbery still was in progress when Davis arrived. Davis recognized Marshall, a long-time acquaintance from the neighborhood, as one of the robbers. He admonished her to "mind her own business," as he and the other robbers sped off. Davis could not recall a gun in the possession of any of the robbers.
After the robbers fled, Marcia Manker left her kitchen window and walked across the street to offer aid. Valentine asked to use Manker's telephone. He called his wife to advise his keys had been stolen and also called 911. The following from the recorded exchange between Valentine and the 911 operator was admitted into evidence over Marshall's Sixth Amendment objection:
[911 Operator]: Hello can I help you?
[Victim]: Yeah. I ... got an emergency.

*471 [911 Operator]: What's your emergency?
[Victim]: It's just armed robbery.
[911 Operator]: Okay. When did this occur? What city?
[Victim]: What street is this?
Unidentified Speaker: It[']s Third, 49th and Third.
[Victim]: 43rd and 11th Court.
....
[911 Operator]: North42 Northwest?
[Victim]: Yes[,] by the park.
[911 Operator]: Okay. Do you need anyone? Are you injured?
....
[Victim]: No.
[911 Operator]: Okay. Thank you. What is your name? (emphasis added).
[Victim]: Leon Valentine.
[911 Operator]: Okay. What's your phone number?
[Victim]: It's in my phone, so I'm using somebody else[']s phone.
[911 Operator]: Okay. Leon[,] how many people?
[Victim]: I don't know. There was some people at the park that witnessed it. They just talking to me now. [sic]
[911 Operator]: Okay. Tell me what happened.
[Victim]: I ... am a Real Estate Broker. I pulled over to the side. I was using my phone. And these guys, they pulled up, like they were asking for directions. One of them, the guy, another guy with ... a gun, they took off with my car [keys].
[911 Operator]: Okay. Were these black males?
[Victim]: yes, these black males in a white Sentra. It doesn't, without a tag. [sic]
[911 Operator]: White what kind of.
[Victim]: In a white Sentra.
....
[Victim]: They were asking for directions, the guy withthe one another guy with a gun, they took all my stuff.
[911 Operator]: Okay. Were these black males?
[Victim]: yes. 3 black males, white Sentra. And it doesn't [have] a tag.
[Unidentified Speaker]: Orange man got in the back seat.
....
[Unidentified Speaker]: Orange Man, that's all I know, they call him Orange Man.
....
[911 Operator]: Do you know what he was wearing?
[Victim]: No gold teeth and on the bottom. I don't remember what, I think one of them had a red shirt.
[911 Operator]: Okay. The one that had the gun, what was he wearing?
[Victim]: Two of them had guns.
[911 Operator]: Okay.
[Victim]: That's right. They took my hat, my Panama Hat.
[911 Operator]: It was a Panama Hat?
[Victim]: They took my tennis racquet, all man, they left with all my tennis. [sic]
[Unidentified Speaker]: They have your keys.
[911 Operator]: What else?
[Victim]: He damn sure took everything.
[911 Operator]: Okay. Thank you are at the park now there? [sic]
[Victim]: They took my car keys so I can't even move.

*472 [Unidentified Speaker]: They coming back for the car.
[Victim]: They took my wallet[.]
....
[Unidentified Speaker]: They got your address. Your keys, your house keys.
....
[911 Operator]: We will be there as soon as possible. All right thank you.
The victim passed away prior to trial from an unrelated cause.
The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions the accused shall enjoy the right ... to be confronted with witnesses against him." In Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held the admissibility of a hearsay statement made by a declarant not available to testify at trial violates the Sixth Amendment if (1) the statement is testimonial, (2) the declarant is unavailable, and (3) the defendant lacked a prior opportunity for cross-examination of the declarant. See also State v. Lopez, 974 So.2d 340, 345 (Fla.2008). There is no question that Marshall had no opportunity to cross-examine the victim before he died or that he was unavailable to testify at trial. Thus, we must determine whether the content of the 911 tape is "testimonial" and thus subject to the requirements of the Sixth Amendment's Confrontation Clause.
In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court undertook to set forth parameters for determining whether a statement is testimonial or not. As Davis explains:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
547 U.S. at 822, 126 S.Ct. 2266 (emphasis added).
Davis involved two separate cases decided by the Washington and Indiana Supreme Courts. See State v. Davis, 154 Wash.2d 291, 111 P.3d 844 (2005); Hammon v. State, 829 N.E.2d 444 (Ind.2005). In both cases, the trial courts had admitted statements made by victims of domestic battery and the defendants argued the admission of the statements, in the absence of the declarant's testimony at trial, violated their Sixth Amendment right to confrontation.
In Davis, the relevant statements were made to a 911 emergency operator as the declarant was being attacked by the defendant. The declarant identified Davis as the assailant. In Hammon, the declarant was waiting on the front porch and her assailant was inside their home when the police arrived. The victim was escorted to a separate room, where she was questioned. The Supreme Court held that the victim's statement in Hammon was testimonial because "[t]here was no emergency in progress and the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." Id. at 829-830, 126 S.Ct. 2266.
Our case is analogous to Hammon. As in Hammon, the crime was complete. The perpetrators had fled. The victim remained on the side of the road where he initially had pulled off to make his business call. The street was a residential neighborhood street across from a park. Two neighbors were at the victim's side. He *473 had borrowed a telephone to call 911 and his wife. I am of the view that once the 911 operator ascertained the victim was not injured by asking, "Are you injured in any way?" and received a "No" response, the nature of the call changed from nontestimonial to testimonial, rendering any testimony after the "No" response inadmissible. As in Hammon, "there was no emergency in progress" and the "primary, if indeed not the sole, purpose of the interrogation [became] to investigate a possible crime." Id. at 829-830, 126 S.Ct. 2266.
The majority relies on U.S. v. Proctor, 505 F.3d 366 (5th Cir.2007), to support affirmance. I find Proctor readily distinguishable from the instant case. In Proctor, Proctor's brother, Yogi, called 911 to report that Proctor, a convicted felon who may have been under the influence of drugs at the moment, had snatched a gun from the dashboard of Yogi's vehicle, parked in front of a nightclub, fired it twice into the ground, and was "believed [to have] run back into the nightclub" from which Yogi and his friend had just left. Id. at 368. The transcript of the recorded exchange between Yogi and the 911 operator indicated that Proctor was in close proximity when Yogi called 911 and expressed impending fear that his brother would harm someone inside the nightclub:
Operator: What's going on?
[Yogi]: What's going on is my little brother just took a gun out of my car belong[ing] to somebody else and shot it in the ground twice and he is convicted felon and his name is Kendrick.
....
Operator: Where's he at now?
[Yogi]: I don't know. I think he's upstairs in this club.
Operator: And he's in the club with the gun now?
[Yogi]: Yes Ma'am. He was in the club.
....
Operator: Okay, why did he take the gun out, do you know?
....
[Yogi]: Ma'am, he just, I don't know what's wrong with him, Ma'am, my Momma think he's on cocaine, so that's probably what's wrong with him, but he a convicted felon, he ain't supposed to possess no gun.
Id. at 368-69. Proctor contended the above statements were testimonial. Relying on Davis, 547 U.S. at 813, 126 S.Ct. 2266, the Proctor court concluded otherwise:
Yogi's call to 911 was made immediately after Proctor grabbed the gun and fired it twice. During the course of the call, [Yogi] recounts what just happened, gives a description of his brother, indicates his brother's previous criminal history, and the fact that his brother may be under the influence of drugs. All of these statements enabled the police to deal appropriately with the situation that was unfolding..... Proctor was armed and possibly dangerous.
505 F.3d at 371-72 (emphasis added). The emergency was "not one that had passed." Id. at 372. In contrast, in the case before us, the emergency had passed. The robbers had fled, the danger dissipated and the victim was safe.
Our case is factually much more similar to this court's recent case, Paraison v. State, 980 So.2d 1134 (Fla. 3d DCA 2008). The case came to us on Paraison's direct appeal from a judgment of conviction and sentence for armed burglary with assault/battery, kidnapping with a weapon and armed robbery with a firearm. The charges stemmed from an early morning burglary of the home of an elderly woman, Mrs. Whitehead, who had been battered, robbed, and bound with duct tape by the intruders. After Mrs. Whitehead had *474 freed herself, she called her son and police, who arrived within three to five minutes of the call. We determined Mrs. Whitehead's statement to the police officers concerning what had occurred that night was inadmissible despite the fact the statements were made in close proximity to the event and Mrs. Whitehead still was "nervous and apparently in shock" when she made the statements. Id. at 1135. Analogizing to the facts of Hammon, we concluded "there was no ongoing emergency at the time Officer Hayes interviewed Mrs. Whitehead. Officer Hayes was simply interviewing the victim of a crime to ascertain the facts necessary to establish criminal activity, assist in further investigation, and further a possible future prosecution." Id. at 1136. Similarly, in our case, there was "no ongoing emergency," at least from the time Valentine responded to the 911 operator that he "[didn't] need anyone" and was "not injured." See Davis, 547 U.S. at 830, 126 S.Ct. 2266 (finding statements made by the victim to interrogating officer in Hammon after it was ascertained "there was no immediate threat to her person" to be testimonial and therefore subject to the Confrontation Clause).
Other cases are instructional. In Lopez, the victim, Hector Ruiz, met Officer Gaston in the parking lot and told Gaston he was abducted at gun point. 974 So.2d at 343. Ruiz indicated "Lopez, who was also standing in the parking lot, was the person who had pointed a gun at him and forced him out of his home." Id. (emphasis added). The trial court admitted Ruiz's statement based on the excited utterance exception to hearsay. On appeal, Lopez argued his constitutional confrontation right was violated, while the State argued Ruiz's statements were nontestimonial. Id. at 344. The Florida Supreme Court relied heavily on Davis to reach its conclusion that "Ruiz's statement to Officer Gaston was testimonial." Id. at 347. Relying on Davis, the Lopez Court set out the test to determine whether statements are testimonial or nontestimonial:
"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicting that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or to prove past events potentially relevant to later criminal prosecution."
Id. at 347 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266). Notably, the Court stated, "[a]t the time Officer Gaston approached him, Ruiz was standing in a parking lot about twenty-five yards away from Lopez, separated from his alleged abductor in much the same way the declarant in Hammon was separated from defendant Hammon when the police arrived." 974 So.2d at 347. Thus, even where the defendant is still on the scene, the Florida Supreme Court has determined there is no ongoing emergency.
I also find instructive State v. Kirby, 280 Conn. 361, 908 A.2d 506 (2006). This case involves the abduction of the victim, Leslie Buck, by the defendant, Russell Kirby. The 911 call at issue was made by Buck from her home shortly after she managed to escape her captor by leaving him stranded on the shoulder of a nearby interstate highway. Id. at 514. On appeal, the defendant argued, among other things, that the trial court improperly admitted into evidence Leslie's statements to the 911 dispatcher. Id. at 516. Choosing to invoke a plenary standard of review rather than the more traditional abuse of discretion standard typically applied to issues of admissibility of evidence in courts of appeal, *475 the Kirby court applied "the Davis test" to the facts of the case and concluded Leslie's statements to the 911 dispatcher were testimonial and, therefore, inadmissible. 280 Conn. 361, 908 A.2d 506, 522. The primary purpose of the call, according to the court, was "to investigate and apprehend the suspect from a prior crime, rather than to solve an ongoing emergency or crime in progress at the time of the call." Id. at 523.
More importantly, the court noted:
the call ... was made after the emergency had been averted and [Leslie] no longer was under any threat from the defendant because she already had escaped and had left him stranded on the side of the road. Thus, although [Leslie] might have needed emergency medical assistance at the time she made the call, the bulk of her conversation with [the 911 dispatcher] nevertheless consisted of her account of a crime that had happened to her in the recent past, rather than one that was happening to her at the time of the call.
Id. (emphasis added). Similarly, in the case before us, the bulk of the victim's statements consisted of his account of a recent crime in the form of information that could be used to identify the suspects, rather than statements of a crime in progress.
Because the erroneously admitted telephone call was the only evidence to support the jury's conclusion that Marshall was guilty of armed robbery, the error cannot be deemed harmless. I would reverse the conviction in this case and remand for a new trial, with instruction to redact from the 911 tape the entirety of the interrogation after the dispatcher determined the victim was not injured.

ON MOTION FOR REHEARING
PER CURIAM.
The motion for rehearing is denied.
CORTIÑAS and SALTER, JJ., concur.
SHEPHERD, J., dissents for the reasons stated in the dissent to the panel opinion dated January 20, 2010.
Before RAMIREZ, C.J., and COPE, GERSTEN, WELLS, SHEPHERD, SUAREZ, CORTIÑAS, ROTHENBERG, LAGOA and SALTER, JJ.

ON MOTION FOR REHEARING EN BANC
The motion for rehearing en banc is denied.
WELLS, CORTIÑAS, ROTHENBERG, LAGOA and SALTER, JJ., concur.
RAMIREZ, C.J. and SHEPHERD and SUAREZ, JJ., dissent for the reasons stated in the dissent to the panel opinion dated January 20, 2010.
COPE, J. (specially concurring in denial of rehearing en banc).
Because a substantial question is presented, compare, e.g., People v. Bryant, 483 Mich. 132, 768 N.W.2d 65 (2009), cert. granted, ___ U.S. ___, 130 S.Ct. 1685, 176 L.Ed.2d 179 (2010), with People v. Casique, 2009 WL 1508463 (Cal.Ct.App.2009), and Collins v. State, 873 N.E.2d 149 (Ind. Ct.App.2007), I favored consideration en banc, but that motion was unsuccessful.
On the merits, I believe the panel majority reached the correct result. The issue is whether the questions asked by the 911 operator called for answers which were testimonial in nature. Under the circumstances of this case, the answer is no.
The United States Supreme Court in Davis v. Washington, 547 U.S. 813, 126 *476 S.Ct. 2266, 165 L.Ed.2d 224 (2006), determined that where the 911 operator asked questions whose primary purpose was to enable police assistance to meet an ongoing emergency, the responses were not testimonial in nature. Id. at 828, 126 S.Ct. 2266.
In this case the facts are accurately stated in the dissenting opinion. The perpetrators took the victim's wallet, which had his address, and his house and car keys. As stated in the 911 call, there was an ongoing risk that the perpetrators would go to the victim's house and use the keys to gain entry, or return to hijack the car. Under the facts of the case, the emergency was ongoing. While there are factual dissimilarities, the decision in U.S. v. Proctor, 505 F.3d 366 (5th Cir.2007), is useful by analogy.
GERSTEN, J. (dissenting).
I respectfully dissent from the denial of rehearing en banc. This matter is one in which the majority has perhaps overlooked or misapplied the tenets that the United States Supreme Court stated in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) ("Davis & Hammon").
Judge Shepherd wrote a compelling dissent to the majority's P.C.A. with a citation to United States v. Proctor, 505 F.3d 366 (5th Cir.2007). Although I am unable to write a better response to the majority's P.C.A. than Judge Shepherd's dissent,[1] the bottom line, as Judge Shepherd convincingly wrote, is that there was no ongoing emergency in this case.
I admit, prior to Crawford, the majority would have properly applied the law in effect since Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). However, Justice Scalia writing for the majority in Crawford, essentially receded from Roberts and reaffirmed the rather plain wording of the United States Constitution's Sixth Amendment Confrontation Clause. The Confrontation Clause states, "[i]n all criminal prosecutions the accused shall enjoy the right ... to be confronted with witnesses against him." Crawford, a 9-0 opinion, clearly stated that "testimonial hearsay" was the principal, if not the only, object of concern of the Confrontation Clause. 541 U.S. at 53, 124 S.Ct. 1354.
A criminal defendant has the right to confront witnesses testifying against him or her. Implicit and explicit in that right, a defendant has the right to: 1) be present at his or her trial; 2) confront witnesses against him or her; and 3) cross-examine any witness. Any limitation on these rights raises a claim of a Confrontation Clause violation.
Turning to this case, there are two questions: First, the question is whether the 911 statements are hearsay. Second, if so, are the statements testimonial? If the statements are testimonial, then the Confrontation *477 Clause applies, and the statements should not have been admitted.
At trial, the 911 call was introduced to establish that the defendant was armed. Because the jury believed the defendant was armed, the defendant's sentence was enhanced. Thus, the call was truly "asserted for the truth of the matter," resulting in the truth of a life sentence for the defendant. § 90.801(1)(c), Fla. Stat. (2004). Even the majority does not dispute that a 911 call is hearsay. Therefore, since the statements were hearsay, the next question is whether the statements were testimonial.
The testimonial nature of the statements, in my opinion, is also clear. Under Crawford, testimonial statements are not admissible unless: 1) the declarant is unavailable at trial (declarant here was not available); 2) the prosecution demonstrates that the declarant is unavailable (prosecution so proved); and 3) the defendant had a "prior opportunity to cross-examine" the unavailable witness (this did not occur). 541 U.S. at 36, 124 S.Ct. 1354. Crawford considers statements made to police or other governmental agencies to be testimonial. 541 U.S. at 52, 124 S.Ct. 1354. Thus, the 911 call was a testimonial statement that was used against the defendant in this case.
After Crawford, the Court decided the dual cases of Davis & Hammon. These cases dealt with the admissibility of 911 calls and the meaning of interrogation. The Court stated, "[W]e use [the term interrogation] in its colloquial, rather than any technical legal, sense ... and we need not select among [the various definitions] in this case." 547 U.S. at 822, 126 S.Ct. 2266.
Davis & Hammon introduced the judicial primary purpose test. Under the primary purpose test, statements are non-testimonial when made under circumstances objectively indicating that the primary purpose of the interrogation is to enable police to meet an ongoing emergency. The Court determined that the statement becomes "testimonial" when the circumstances objectively indicate that there is no ongoing emergency, and the primary purpose is to establish or prove past events relevant to later criminal prosecution. 547 U.S. at 822, 126 S.Ct. 2266.
Davis & Hammon stand for the proposition that a non-testimonial statement can "evolve into a testimonial statement" once the emergency has been resolved. 547 U.S. at 828, 126 S.Ct. 2266. In Davis, once the operator gained the information necessary to assess the exigency, the emergency ended. In Davis, the defendant drove away, but the operator continued the questioning. The Court held that the remaining information was testimonial. 547 U.S. at 813, 126 S.Ct. 2266.
Courts have given varied interpretations to the ongoing emergency language in Davis & Hammon. See, e.g., Colon v. Taskey, No. 1:08-CV-199, 2009 WL 1616110 (N.D.Ohio 2009); James v. Marshall, No. CV 06-3399-CAS(E), 2008 WL 4601238 (C.D.Cal.2008); State v. Lewis, 361 N.C. 541, 648 S.E.2d 824 (2007); Lee v. Cain, No. 06-9669, 2007 WL 2751210 (E.D.La.2007); State v. Basil, 2009 WL 1174777 (N.J.2010); State v. Lucas, 407 Md. 307, 965 A.2d 75 (Md.2009); Sanon v. State, 978 So.2d 275 (Fla. 4th DCA 2008). But see, e.g., U.S. v. Proctor, 505 F.3d 366 (5th Cir.2007); State v. Metzger, 999 A.2d 947 (Me.2010); Hester v. State, 283 Ga. 367, 659 S.E.2d 600 (2008).
Turning again to this case, the lightning rod question is whether there was an ongoing emergency. The 911 call was as follows:
[911 Operator]: Hello can I help you?
[Victim]: Yeah, I ... got an emergency.

*478 [911 Operator]: What's your emergency?
[Victim]: It's just armed robbery.
[911 Operator]: Okay. When did this occur? What city?
[Victim]: What street is this?
[Unidentified Speaker]: It[']s Third, 49th and Third.
[Victim]: 43rd and 11th Court.
....
[911 Operator]: North42 Northwest?
[Victim]: Yes[,] by the park.
[911 Operator]: Okay. Do you need anyone? Are you injured?
....
[Victim]: No.
[911 Operator]: Okay. Thank you. What is your name?
[Victim]: Leon Valentine.
[911 Operator]: Okay. What's your phone number?
[Victim]: It's in my phone, so I'm using somebody else[']s phone.
[911 Operator]: Okay. Leon[,] how many people?
[Victim]: I don't know. There was some people at the park that witnessed it. They just talking to me now. [sic]
[911 Operator]: Okay. Tell me what happened.
[Victim]: I ... am a Real Estate Broker. I pulled over to the side. I was using my phone. And these guys, they pulled up, like they were asking for directions. One of them, the guy, another guy with ... a gun, they took off with my car [keys].
[911 Operator]: Okay. Were these black males?
[Victim]: yes, these black males in a white Sentra. It doesn't, without a tag. [sic]
[911 Operator]: White what kind of.
[Victim]: In a white Sentra.
....
[Victim]: They were asking for directions, the guy withthe one another guy with a gun, they took all my stuff.
[911 Operator]: Okay. Were these black males?
[Victim]: yes. 3 black males, white Sentra. And it doesn't [have] a tag.
[Unidentified Speaker]: Orange man got in the back seat.
....
[Unidentified Speaker]: Orange Man, that's all I know, they call him Orange Man.
....
[911 Operator]: Do you know what he was wearing?
[Victim]: No gold teeth and on the bottom. I don't remember what, I think one of them had a red shirt.
[911 Operator]: Okay. The one that had the gun, what was he wearing?
[Victim]: Two of them had guns.
[911 Operator]: Okay.
[Victim]: That's right. They took my hat, my Panama Hat.
[911 Operator]: It was a Panama Hat?
[Victim]: They took my tennis racquet, all man, they left with all my tennis. [sic]
[Unidentified Speaker]: They have your keys.
[911 Operator]: What else?
[Victim]: He damn sure took everything.
[911 Operator]: Okay. Thank you are at the park now there? [sic]
[Victim]: They took my car keys so I can't even move.

*479 [Unidentified Speaker]: They coming back for the car.
[Victim]: They took my wallet[.]
....
[Unidentified Speaker]: They got your address. Your keys, your house keys.
....
[911 Operator]: We will be there as soon as possible. All right thank you.
Here, the honest reader has to question whether there was an ongoing emergency when the victim made the 911 call. The declarant stated that he did not need anyone and that he was not injured. Once that was established, the 911 operator then gathered information that would be used to, "establish or prove past events relevant to later criminal prosecution." Davis, 547 U.S. at 813, 126 S.Ct. 2266. In this case, the testimony was used to prove that the defendant was armed.
One must ponder if there was an ongoing emergency, what was it? The obvious argument is that the victim was afraid for his wife at home as his wallet and keys were stolen. If that were the case, then why didn't the 911 operator ask the declarant for his home phone number so that the declarant's wife could be notified that there was an emergency? More importantly, if there was an emergency, why didn't the 911 operator get the declarant's address (since the declarant stated that the perpetrators had his wallet and keys) in order to send a police car to safeguard the declarant's family?
I see no difference from this case or any other garden variety purse snatch, where an assailant takes a victim's personal information and keys. If these circumstances always constitute an ongoing emergency, then the majority's position eviscerates Crawford, Davis & Hammon, and a gaggle of nationwide state and federal cases. However, I do not believe it is within a state intermediate appellate court's purview to ignore precedent.
If the Florida Supreme Court does not step in to clarify whether an armed robbery, strong arm robbery, or a purse snatch constitutes an ongoing emergency, then we are sadly headed towards jurisprudential entropy.
RAMIREZ, C.J., and SUAREZ, J., concur.
NOTES
[1] But for Judge Shepherd's dissent, this case would have passed into jurisprudential wasteland. That wasteland is the amalgam of P.C.A.'s that are piled up and indistinguishable from one another, so much so, that a P.C.A. renders a case meaningless to all but the parties and advocates who argued the case.

To that end, Judge Shepherd's dissent brought this P.C.A. to life. Judge Shepherd's dissent brought enough context and meaning to me, that I felt compelled to write yet another dissent on denial of rehearing en banc. This dissent, at least, let's Henry Marshall know that others listen to his plight. These others feel that the importance, predictability, and purity of law are noble goals for judges and justices.