5 A.3d 730

**Ronald COX**

v.

**STATE of Maryland.**

**No. 473, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 17, 2010.

630

632

Mark Gitomer of Owings Mills, MD, for appellant.

Edward J. Kelley (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: DAVIS *, GRAEFF, ALAN M. WILNER, (Retired, Specially Assigned), JJ.

GRAEFF, J.

On January 29, 2009, a jury sitting in the Circuit Court for Baltimore City convicted Ronald Cox, appellant, of first degree murder, use of a handgun in the commission of a felony or a crime of violence, wearing, carrying or transporting a handgun, and possession of a regulated firearm after conviction of a disqualifying crime. The court imposed a sentence of life imprisonment on the first degree murder conviction and a consecutive sentence of twenty years, five years without parole, on the conviction for use of a handgun.[1]

---

* Arrie W. Davis, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

**1.** The court also sentenced appellant to five years, without the possibility of parole, on the conviction for possession of a regulated firearm

Appellant presents the following issues for our review, which we have rephrased:

1. Is the right to confrontation implicated: (a) when an inmate admits to another inmate in jail that he committed a crime; or (b) when the defendant, by his presence and his silence, adopts that admission as his own statement?

2. Did the trial court err in admitting appellant's statements to Michael West because they were the "fruit" of an illegal arrest?

3. Was the evidence sufficient to support appellant's convictions? For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 18, 2008, appellant was indicted, in three separate indictments, on five charges: (1) first degree murder; (2) conspiracy with Rodney Johnson to murder the victim; (3) unlawful use of a handgun in the commission of a felony or a crime of violence; (4) wearing, carrying and transporting a handgun upon his person; and (5) possession of a regulated firearm by a person previously convicted of a disqualifying crime. Appellant and Mr. Johnson initially were scheduled to be tried together, but the court ultimately severed the trials.

### Suppression Hearing

On January 5, 2009, the court held a hearing on motions, including appellant's motion to suppress the gun seized from a car driven by appellant.[2] Detective Milton Smith, III, a

---

after conviction of a disqualifying crime, which was to run concurrently with the other sentences. For purposes of sentencing, the court merged the conviction for wearing, carrying, or transporting a handgun into the conviction for use of a handgun in the commission of a felony or a crime of violence.

**2.** At the beginning of the motions hearing, appellant's counsel discussed the plea agreement that the State had offered appellant ten days earlier. In exchange for appellant pleading guilty to being an accessory after the fact, and on the condition that appellant testify against Mr. Johnson, the State would recommend a sentence of five years with parole. As an

member of the Baltimore City Police Department, testified that, on December 28, 2007, he was on patrol in an unmarked vehicle with Detectives Derek Phyall and Eugene Bush. At approximately 12:30 p.m., the officers observed that the driver of a black 2006 Mercedes Benz was not wearing his seatbelt, and the driver failed to come to a complete stop at a stop sign. The officers initiated a traffic stop of the vehicle.

Detective Smith approached the passenger side of the vehicle. He observed that the passenger's hands were visibly shaking "in a nervous manner." Detective Smith asked the passenger his name, and at that point, a broadcast came over the police radio regarding a shooting at Church Square, which was approximately ten city blocks away.[3] The broadcast stated that a black male in a black hooded sweatshirt was seen fleeing the scene by foot.

After the broadcast, the passenger, who was wearing a black hooded sweatshirt, became more nervous. His hands began to shake uncontrollably, he started making erratic eye movements, and his chest was "moving through his shirt." In response to this behavior, Detective Smith asked the passenger if he had anything illegal on his person. The passenger replied in the negative, and the detective inquired if he "could check." The passenger removed his seatbelt, with his hands "still shaking vigorously," and he exited the car. Detective Smith conducted a pat down of the passenger, which revealed no weapons or drugs. Detective Smith identified Mr. Johnson as the passenger of the vehicle and appellant as the driver.

Detective Phyall approached appellant on the driver's side of the vehicle. He informed appellant why he had been pulled over, and he asked for appellant's driver's license and registration. Appellant appeared calm during this conversation.

---

additional part of the agreement, appellant would receive five years for a pending violation of probation charge, which would run concurrent with the sentence of five years on the conviction as an accessory after the fact. Appellant declined the State's plea offer.

**3.** Mr. Smith subsequently testified that he heard the radio broadcast at 12:53 p.m.

Detective Phyall testified that he did not call dispatch to ascertain the validity of appellant's license or registration because, approximately three to five minutes after the stop, he heard the broadcast regarding the shooting and the description of the fleeing suspect. Detective Smith alerted Detective Phyall that the passenger matched the description of the suspect. Appellant and Mr. Johnson were patted down, and they were seated on the curb. Detective Phyall asked appellant if there was anything in the car, and he testified that appellant consented to a search of the vehicle by stepping out of his vehicle with his hands in the air. He admitted, however, that no verbal consent was given.

Detective Phyall searched the car and found a gun inside the trunk. Once the gun was found, both appellant and Mr. Johnson were placed under arrest.[4]

Detective Bush testified that, during the traffic stop, he initially stood at the rear of the vehicle. After being alerted that the passenger matched the description of the alleged shooter, Detective Bush assisted Detective Phyall by conducting a pat down of appellant; no weapons or drugs were found. Detective Bush stayed with appellant and Mr. Johnson on the curb while Detective Phyall searched the vehicle. Detective Phyall found the gun "[p]robably several minutes after the vehicle was pulled over." Detective Bush then "cleared" the weapon by pulling out the magazine, taking the safety off, and bringing in the slide. As a result of these actions, a round was ejected from the gun's chamber.

During cross-examination of the three detectives, appellant's counsel extensively questioned the officers regarding the timeline of events during the traffic stop. Specifically, counsel established that, although calls regarding the Church Square shooting came in at 12:38 p.m. and 12:40 p.m., it was not until 12:53 p.m. that a call came over the radio indicating that a suspect in a black hoodie was seen fleeing the scene. The

---

4. After appellant was taken to central booking, Detective Phyall issued citations for not wearing a seatbelt and for running a stop sign.

officers testified that the time periods written in the statement of probable cause, as well as that to which they testified in court, were approximations.

The State argued that the initial stop of appellant and Mr. Johnson was a valid traffic stop. With respect to the subsequent search of the trunk, which uncovered the firearm, the State argued that the search was valid because the police had probable cause to believe that the vehicle contained evidence of a crime, based on the radio call regarding the shooting and that the passenger matched the description of the suspected shooter.

Appellant's counsel argued that the detention was illegal, focusing on the length of the traffic stop. He asserted that the police did not have probable cause to believe that appellant was involved in criminal activity until 12:53 p.m., when they received the radio call with the description of the fleeing shooter. Appellant's counsel stated that "the detention was illegal [because] [t]hey should have been given a ticket for the seatbelt and sent on their way [and] [t]he fact that they were even in police custody at 12:53," 23 minutes after the initial stop, was illegal.

On January 6, 2006, the day after the hearing, the court granted the motion to suppress. The court made factual findings that the stop occurred no later than 12:30 p.m., that the first call informing the officers about the shooting took place at 12:38 p.m., and that the call with the description of the shooter, which prompted the officers to ask appellant and Mr. Johnson to exit the car, occurred at 12:53 p.m. Stating that the officers failed to account for what took place between 12:30 p.m. and 12:53 p.m., the court found that, "during the time period that the vehicle was stopped, there was not the traffic stop activity of issuing a citation." The court stated that it could not "find any other legitimate investigatory reason for detaining the two for 15 to 23 minutes if they had no evidence of the shooting in the area before 12:53," and it concluded that the detention "exceeded the scope of the purported reason for the traffic stop." The court found that

the police did not have reasonable suspicion or probable cause to extend the stop until they learned of the shooting. Accordingly, it granted appellant's motion to suppress the gun.

On January 23, 2008, another motions hearing took place.[5] Appellant first moved to suppress statements that he made in central booking to an individual named Michael West. Defense counsel argued that, but for the illegal traffic detention, appellant would not have been arrested and in custody to talk to Mr. West. Counsel argued that any statements to Mr. West should be excluded as "fruits" of the illegal detention.[6]

The court denied appellant's motion, finding that appellant's conversations with Mr. West did not involve a state actor, and appellant's "decision to talk to Mr. West was an independent decision not related in any way to any illegal or unlawful contact by the Baltimore City Police Department." The court stated that appellant's decision to talk rendered his statements "outside of the ambit of the fruit of the poisonous tree doctrine."

Appellant then argued that the court should exclude statements that Mr. Johnson made to Mr. West in central booking, arguing that these statements constituted inadmissible hearsay. The State argued that Mr. Johnson's statements were admissible under either of two hearsay exceptions: (1) statements of a co-conspirator; and/or (2) tacit or vicarious admissions. The court denied the motion with respect to all but one of the statements. As discussed in more detail, *infra*, it ruled

---

5. Before argument began, the State entered a *nolle prosequi* on the charged crime of conspiracy to commit murder. Mr. Johnson, appellant's former co-defendant, had been tried prior to appellant, and he had been found not guilty on all charges relating to the murder of the victim.

6. Counsel was referring to "the fruit of the poisonous tree doctrine," which is "an aspect of the exclusionary rule, a judicially-imposed sanction for violations of the fourth amendment right against unreasonable searches and seizures in state prosecutions." *Ferguson v. State,* 301 Md. 542, 548 n. 2, 483 A.2d 1255 (1984). This doctrine provides for the exclusion of "evidence that was the indirect product or 'fruit' of police conduct in violation of the fourth amendment." *Id.* at 548, 483 A.2d 1255.

that Mr. Johnson's statements to Mr. West were made in the presence of appellant, who reasonably would have disagreed with the statements if untrue, and therefore, with one exception, Mr. Johnson's statements to Mr. West were admissible as tacit admissions.

On January 27, 2009, trial commenced. Baltimore City Police Officer William Keitz testified that, at 12:38 p.m. on December 28, 2007, he answered a call for a shooting at the Church Square Shopping Center. He immediately went to the shopping center and observed a black male lying on his back in front of the Stop Shop & Save grocery store. The victim was bleeding and unresponsive, and Officer Keitz called for a medic. He found a head wrap and a bullet casing on the scene.

Natalie Hoban, a crime lab technician for the Baltimore City Police Department Mobile Unit, responded to a call for a homicide. She and another evidence technician, Tech Payne, arrived at the scene at 2:40 p.m. Ms. Hoban marked the physical evidence found at the scene, including a head scarf, or do-rag, and a 9–millimeter cartridge casing. The cartridge casing was processed for latent prints, but no prints were found.

David McDermott, a homicide detective with the Baltimore City Police Department, responded to the scene of the shooting with Detective Chester Norton at approximately 1:00 p.m. When they arrived at the scene, the victim had already been transported to the hospital, but Detective McDermott observed the head scarf and the cartridge casing. As the primary detective on the scene, Detective McDermott was responsible for directing police personnel, checking the area for evidence, and locating witnesses at the crime scene. He canvassed the area on foot, but he was unable to locate any witnesses or additional evidence.

Dr. Donna Vincenti, an assistant medical examiner with the Office of the Chief Medical Examiner, was admitted as an expert in the field of forensic pathology. Dr. Vincenti conducted an autopsy on the victim's body on December 29, 2007.

The victim sustained a gunshot wound to the head, and Dr. Vincenti testified that the cause of death was homicide.

Detective Phyall testified about the traffic stop of appellant and Mr. Johnson, advising the jury that the vehicle was stopped between 12:00 and 12:30 p.m., approximately 12 blocks from the scene of the murder. His trial testimony generally was consistent with his testimony at the suppression hearing. Due to the court's ruling, however, he did not testify regarding the discovery of the handgun in the trunk or the subsequent arrest of appellant and Mr. Johnson.

Mr. Michael West testified about a conversation that took place between Mr. Johnson, himself, and appellant. Mr. West was arrested on December 28, 2007, and the next day, December 29, 2007, he was released to the day room in central booking, where he had a conversation with appellant and Mr. Johnson. Mr. West had known Mr. Johnson for approximately fifteen years.

Mr. West testified that Mr. Johnson told him, with appellant standing within "arm's reach," that he and appellant had murdered the victim, a person Mr. West had known for years. Mr. Johnson told Mr. West that he and appellant were riding on Carlisle Street when they observed the victim. Appellant offered Mr. Johnson $15,000 to kill the victim, and Mr. Johnson replied: "I'll do it." Appellant gave Mr. Johnson a gun, described by Mr. West as "a nine." Mr. Johnson exited the car, wearing a black hoodie. He then returned to the vehicle, and placed the gun in the trunk. Appellant and Mr. Johnson drove away, but shortly thereafter, they were pulled over by the police for running a stop sign.[7] Mr. West testified that appellant contributed to the conversation, denying that he ran the stop sign and commenting that, when they were pulled over, the police noticed that Mr. Johnson was visibly nervous.

---

7. As explained *infra,* the court precluded Mr. West from testifying to Mr. Johnson's statement that he shot the victim in the back of the head because appellant, who was sitting in his car when the alleged shooting took place, did not have first-hand knowledge of this action.

After the conversation in central booking, which lasted approximately 45 minutes to one hour, Mr. West contacted Detective Kershaw. He testified that he contacted the police because he "had just found out [his] friend got killed."

That same week, Detective Kershaw picked up Mr. West and brought him to the homicide division. Mr. West identified Mr. Johnson and appellant in separate photo arrays. On the back of the photo array including appellant, Mr. West wrote:

I know this man from central booking and he told me that he was the driver and the one who gave Row dog the gun that killed (TEE) and he also said he wanted to kill (TEE) his self but Row dog said he [would] do it and told Row dog if he do it he would give him $15[,]000 and he did. Michael West [8]

Mr. West testified that he was not offered any incentive by the State's Attorney to testify in this case. Although he was originally detained in the Maryland state system for a handgun violation, his case had been moved to federal court. He had entered into a plea agreement in federal court, where he was facing a sentence of 15 years to life. Mr. West testified that his plea agreement provided that the United States Attorney's Office could ask for less time if he assisted in the prosecution of others, but Mr. West understood that to mean a sentence in federal court, not state court.

Following Mr. West's testimony, the State rested its case. At the close of the State's case, appellant made a motion for judgment of acquittal on all counts, arguing that there was insufficient evidence to support a conviction, because there was not sufficient corroboration of his confession to Mr. West. The court denied the motion.

Appellant did not testify in his own defense. Brendon Hurson, Mr. West's federal public defender, testified to the plea agreement that Mr. West entered into regarding his

---

8. Mr. West testified that "TEE" referred to the victim, Todd Dargan. In Mr. West's testimony, he referred to Mr. Johnson as "Rod Dog," "Row dog," and Roger.

federal case. He explained that Mr. West entered into a cooperation agreement with the United States Attorney's Office whereby, based on Mr. West's cooperation, the government could make a motion to lower the sentencing guideline level in the federal court proceeding.

Following Mr. Hurson's testimony, appellant renewed his motion for judgment of acquittal. The court denied the motion. After jury instructions and closing arguments, the jury found appellant guilty on all charges.

This timely appeal followed.

## I.

### Right to Confrontation

Appellant contends that the court erred in admitting Mr. West's testimony regarding statements that Mr. Johnson made to him at central booking. He argues that this testimony should have been excluded because it violated his "right of confrontation under the Sixth Amendment to the United States Constitution."

The State contends that this claim is unpreserved for our review. Although conceding that appellant "did mention his right to confrontation in the context of arguing the inadmissibility of West's testimony," it asserts that "the thrust of his argument was that the testimony violated state rules against the admission of hearsay," and therefore, we should decline to address appellant's confrontation claim on appeal. On the merits, the State argues that the admission of Mr. Johnson's statements did not violate appellant's right to confrontation for either of two reasons: (1) the statements were not testimonial; and (2) adoptive admissions do not implicate a defendant's right to confrontation.

### A.

### Proceedings Below

As indicated, the admissibility of Mr. Johnson's statements to Mr. West, which implicated Mr. Johnson and appellant in the victim's murder, was addressed at the motions hearing on

January 23, 2009. Appellant's counsel argued that Mr. John-son's statements constituted inadmissible hearsay. He further argued that admitting these statements would be "in complete violation of the confrontation clause," explaining that he would not be able to cross-examine Mr. Johnson regarding these statements.[9]

The State argued that Mr. Johnson's statements to Mr. West should be admitted as a tacit admission by appellant.[10] Noting that appellant did not object to Mr. Johnson's state-ments to Mr. West about his involvement in the murder, the State argued: "[N]ormally if someone's accusing you of being a participant in a murder[,] [that] would certainly rouse your objection." Here, not only did appellant fail to object to Mr. Johnson's statements, he participated in the conversation and added some details. Thus, the State asserted, Mr. Johnson's statements constituted a tacit admission by appellant, *i.e.* he "was agreeing with" Mr. West.

Defense counsel argued that Mr. West needed to testify regarding the circumstances surrounding the conversation before the court could make a determination whether Mr. Johnson's statements could be deemed a tacit admission by appellant. The State arranged for Mr. West to be brought to court.

Mr. West testified to his conversation with Mr. Johnson and "Scoop," who he identified as appellant. He testified, consis-tent with his trial testimony, that Mr. Johnson told him that appellant pointed out the victim, stated that he would give Mr.

---

**9.** Counsel stated that it was his understanding that Mr. Johnson had a "Fifth Amendment right at this point to remain silent because he has pending charges associated with the handgun that was retrieved in this case." As indicated, however, Mr. Johnson had been acquitted of all charges.

**10.** The State also argued that Mr. Johnson's statements were admissible as a statement of a co-conspirator. The trial court rejected that argument, finding that the statements were not made in furtherance of a conspiracy, but "were, at best, statements in which the individuals were bragging about a completed crime." The State has not chal-lenged this finding on appeal.

Johnson $15,000 to kill the victim, and gave Mr. Johnson a gun. Mr. Johnson told Mr. West that he walked up behind "T," shot him in the back of the head, and took off running. He returned to the car, dropped the gun in the trunk, and got in the passenger seat. He and appellant then left and were pulled over by the police.

Mr. West testified that, during the time that Mr. Johnson was talking, "Johnson was sitting down, [appellant] was standing right beside him, and [Mr. West] was standing in front of both of them," "arm-reach" away. At no time did appellant express disagreement with anything Mr. Johnson said. Appellant occasionally participated in the conversation, adding that he provided the gun to Mr. Johnson, that he parked on the street waiting for Mr. Johnson after he killed the victim, and that Mr. Johnson was scared when the police stopped their car.

The court denied appellant's motion to suppress Mr. West's testimony regarding Mr. Johnson's statements, indicating that the motion had "evolved into the State's motion to admit the hearsay statements of Mr. Johnson made to witness West at the Baltimore City intake facility." The court ruled that Mr. Johnson's statements to Mr. West were admissible as a tacit admission, stating:

> The Court finds, based on Mr. West's testimony, that Mr. Cox was present and heard the statement. Mr. West's testimony that Mr. Cox was joining in, adding in information about the statements clearly demonstrates that Mr. Cox heard Mr. Johnson's statement.
>
> Further, Mr. West's testimony that the men were within arms reach corroborates that even though there may have been noise in the facility Mr. Cox was able to hear the statements of Mr. Johnson. The Court finds that the statements are of a type that a reasonable person in Mr. Cox's position would have disagreed with the statements. The statements at issue, in essence, are that Mr. Cox solicited Mr. Johnson to murder T by offering him 15,000 dollars, giving him a gun, waiting for him in a vehicle, as Mr. Johnson allegedly went and shot T.

A reasonable person, the court finds, in Mr. Cox's position would have objected to these statements being made in the presence of another party as they were statements which clearly implicated Mr. Cox in the offense of murder. In the face of these statements, Mr. Cox not only remained silent he joined in adding details, specifically according to Mr. West's testimony, Cox offered that he gave Rodney the gun and he was going to park and wait on Bond and Eager after he killed T.

Upon reviewing the *Henry* [*v. State*, 324 Md. 204, 596 A.2d 1024 (1991), *cert. denied*, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992)] case which is earlier than the commentary in Professor McL[ai]n's book, the *Henry* case requires the following[:] That the party heard and understood the other person's statement; at the time the party had a reasonable opportunity to respond; and under the circumstances a reasonable person in the party's position who disagreed with the statement would have voiced that disagreement. The facts clearly indicate that Cox had an opportunity to respond, that he heard and understood the statements, and as the Court has already found that he would have disagreed with the statements and failed to do so.[11]

## B.

### Preservation

■■ Before addressing the merits, we will address the State's preservation argument. Although acknowledging that

---

11. The court ruled, however, that Mr. West could not testify to Mr. Johnson's statement that he shot the victim in the back of the head. The court explained that *"Henry* also requires that the party must have had first-hand knowledge of the matter addressed," and "Mr. Cox did not have first-hand knowledge of ... Mr. Johnson's conduct after he left Cox's car and went away from Cox where he walked up upon T and allegedly shot him in the back of the head and then returned to the car." Accordingly, the court excluded "that portion of Mr. Johnson's statements that he actually confessed to murdering T out of the presence of Mr. Cox."

appellant "did mention his right to confrontation" in the circuit court, the State argues that the issue is not preserved because "the thrust of [appellant's] argument was that the testimony violated state rules against the admission of hearsay." The State cites to *Collins v. State*, 164 Md.App. 582, 602, 884 A.2d 181 (2005), *cert. denied*, 390 Md. 501, 889 A.2d 418 (2006), in which this Court declined to address an argument regarding the constitutional right to confrontation where the sole argument raised at trial was based on hearsay.

The State's preservation argument is not supported by the record. Appellant clearly raised the issue of his right to confront the witnesses against him. Defense counsel argued that admission of Mr. Johnson's statements through Mr. West's testimony would be "in complete violation of the confrontation clause" because he could "only cross examine Mr. West regarding the nature of these statements but not the declarant." Appellant adequately preserved this issue for appellate review.[12]

## C.

### Testimonial Statements

On the merits, appellant's claim involves the Sixth Amendment to the United States Constitution, which provides that a defendant in a criminal trial has the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. It "guarantees a defendant's right to confront those 'who "bear testimony"' against him." *Melendez–Diaz v. Massachusetts*, —— U.S. ——, ——, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009) (citations omitted).

In *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Sixth Amendment prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was

---

12. On appeal, appellant's sole claim of error is that the admission of Mr. Johnson's statements to Mr. West violated his right to confrontation. That is the only issue we will address.

unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The Supreme Court declined in *Crawford* to "spell out a comprehensive definition of 'testimonial,'" leaving that "for another day." *Id.* at 68, 124 S.Ct. 1354. It did, however, identify a "core class" of testimonial statements:

"[E]x parte in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[""]; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions["]; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"

*Id.* at 51–52, 124 S.Ct. 1354 (citations omitted).

In *Davis v. Washington*, 547 U.S. 813, 817, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court discussed in more detail when statements made in response to police interrogation were testimonial:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266. The Court held that statements to a 911 operator to seek assistance with an ongoing emergency are not testimonial, *id.* at 828, 126 S.Ct. 2266, whereas statements made to investigate past criminal conduct, where there was no present emergency, are testimonial. *Id.* at 830, 126 S.Ct. 2266.

The Court of Appeals has observed that the standards set forth by the Supreme Court for the purpose of identifying whether a statement is testimonial " 'share a common nucleus in that each involves a formal or official statement made or elicited with the purpose of being introduced at a criminal trial.' " *State v. Lucas*, 407 Md. 307, 314, 965 A.2d 75 (2009) (quoting *State v. Snowden*, 385 Md. 64, 81, 867 A.2d 314 (2005)). The standard focuses on a statement " 'made in the course of a criminal investigation initiated by the government.' " *Id.* (quoting *Snowden*, 385 Md. at 81, 867 A.2d 314).

The determination whether an out-of-court statement is testimonial "is a question of constitutional law subject to plenary review by an appellate court." *Head v. State*, 171 Md.App. 642, 649 n. 7, 912 A.2d 1 (2006), *cert. denied*, 398 Md. 315, 920 A.2d 1059 (2007). Here, we hold that Mr. Johnson's statements to Mr. West were not testimonial for purposes of the Confrontation Clause. This is so for several reasons.

Initially, the statements were not a formal declaration, *see Davis*, 547 U.S. at 830 n. 5, 126 S.Ct. 2266 ("formality is indeed essential to testimonial utterance"), and they were not initiated by a known government official. *Id.* at 825, 126 S.Ct. 2266 (statements made "unwittingly" to a government informant are "clearly nontestimonial"). Rather, Mr. Johnson's statements were casual remarks made during a conversation with an acquaintance while waiting in central booking. *See Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 (a witness "who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not").

Moreover, there is nothing to suggest that the statements were made " 'with the purpose of being introduced at a criminal trial.' " *Lucas*, 407 Md. at 314, 965 A.2d 75 (quoting *Snowden*, 385 Md. at 81, 867 A.2d 314). Rather, the statements were made during a conversation with another inmate. The trial court suggested that the purpose of the conversation was to brag about a crime.

Other courts have found that statements by one inmate to another inmate in jail are not testimonial. For example, in *United States v. Johnson*, 495 F.3d 951, 975–76 (8th Cir.2007), the United States Court of Appeals for the Eighth Circuit addressed whether the admission of testimony by an inmate, regarding statements made by Johnson's boyfriend while in jail, violated Johnson's right to confrontation. The Court held that the admission of the statements did not violate the Confrontation Clause because the statements were not formal statements, and they were not "elicited in response to government interrogation whose primary purpose was to establish facts potentially relevant to a criminal prosecution." *Id.* at 976. *Accord United States v. Smalls*, 605 F.3d 765, 780 (10th Cir.2010) (inmate's statement to fellow inmate boasting about murder "undoubtedly nontestimonial under any legitimate view of the law"); *State v. Hughes*, 286 Kan. 1010, 191 P.3d 268, 276 (2008) (Hughes' out-of-court hearsay confession to a cellmate was not testimonial because it was not made " 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' ") (citation omitted). *See also Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004) ("statements ... made during a private conversation" are nontestimonial), *cert. denied*, 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005).

Here, Mr. Johnson's remarks to Mr. West, while in the recreational room of central booking, were not formal statements, they were not elicited in response to government questioning, and they were not made under circumstances in which a reasonable person would believe that the statements would be available for use at a later trial. Accordingly, Mr. Johnson's statements were not testimonial.

The Supreme Court has indicated that only testimonial statements are subject to the Confrontation Clause. *See Davis*, 547 U.S. at 821, 126 S.Ct. 2266 (Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause.... It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay

evidence, is not subject to the Confrontation Clause."). *Accord Clark v. State*, 188 Md.App. 110, 120, 981 A.2d 666 (2009). Because Mr. Johnson's statements were not testimonial, they did not implicate the Confrontation Clause. Appellant's claim in this regard has no merit.

## D.

## Tacit Admissions

The State contends that the admission of Mr. West's testimony regarding Mr. Johnson's statements did not violate the Confrontation Clause for yet another reason. It notes that the trial court admitted Mr. Johnson's statements as tacit admissions by appellant, and it argues that tacit admissions are "not within the target zone of the *Crawford* opinion." Appellant attempts to distinguish the cases relied upon by the State, but he does not otherwise address the merits of the issue raised by the State.

A tacit admission occurs when a person makes "another person's statement his or her own," 6A LYNN MCLAIN, MARYLAND EVIDENCE STATE AND FEDERAL § 801(4):3, at 114 (2d ed.2001), when the person "remains silent in the face of an accusation that, if untrue, would naturally rouse the accused to speak in his or her defense." *Darvish v. Gohari*, 130 Md.App. 265, 278, 745 A.2d 1134 (2000), *aff'd on other grounds*, 363 Md. 42, 767 A.2d 321 (2001). The Court of Appeals has explained that a party " 'may make a "tacit admission," adopting, by his or her silence, another person's statement,' " if the following prerequisites are satisfied:

"(1) the party heard and understood the other person's statement; (2) at the time, the party had an opportunity to respond; (3) under the circumstances, a reasonable person in the party's position, who disagreed with the statement, would have voiced that disagreement. The party must have had first-hand knowledge of the matter addressed in the statement."

*Henry,* 324 Md. at 241–42, 596 A.2d 1024 (citation omitted). *Accord Grier v. State,* 351 Md. 241, 254, 718 A.2d 211 (1998); *Darvish,* 130 Md.App. at 278, 745 A.2d 1134.

Maryland Rule 5–803(a)(2) provides that tacit admissions are not excluded by the general rule against the admission of hearsay.[13] Appellant does not assert error in the court's determination that Mr. Johnson's statement was admissible on evidentiary grounds as a tacit or adoptive admission. Rather, his argument is based on constitutional grounds, that admission of these statements through Mr. West violated his right to confrontation.

Maryland has not addressed whether a tacit admission implicates a defendant's right to confrontation. Other jurisdictions, however, have addressed the issue.

In *State v. Ortiz,* 101 Conn.App. 411, 922 A.2d 244, 256, *appeal denied,* 283 Conn. 911, 928 A.2d 538 (2007), a witness was permitted to testify that Kimberly Lebel stated, in Ortiz's presence, that she and Ortiz "robbed some old man" and stabbed him, and the man died. The Appellate Court of Connecticut concluded that Ortiz's silence constituted an admission of guilt. *Id.* at 258. The court then addressed Ortiz's argument that permitting this adoptive admission to come into evidence violated his right to confrontation. *Id.* at 259. The court rejected that argument, stating:

> Here, the defendant adopted Lebel's statement as his own; thus, the lack of opportunity to cross-examine Lebel does not violate the confrontation clause. *See United States v. Allen,* 10 F.3d 405, 413–14 (7th Cir.1993) ("[The] lack of opportunity to cross-examine the declarant of a statement the defendant has adopted as his own does not violate the

---

**13.** Rule 5–803(a)(2) provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (a) Statement by party-opponent.—A statement that is offered against a party and is:
> \* \* \*
> (2) A statement of which the party has manifested an adoption or belief in its truth. . . .

confrontation clause.... The reason for this is not difficult to understand. An adoptive admission is a statement that the defendant has adopted as his own. Thus the defendant himself is, in effect, the declarant. The witness against the defendant is the defendant himself, not the actual declarant; there is no violation of the defendant's right to confront the declarant because the defendant only has the right to confront the witnesses against him.")

*Id.* at 259.

Other jurisdictions similarly have held that adoptive admissions do not implicate the right to confrontation. *See United States v. Woods,* 301 F.3d 556, 561 (7th Cir.2002) ("If the statements are Woods' own—either by virtue of the fact he made or adopted them—there is no hearsay and no confrontation problem because the witness against the defendant is himself."); *United States v. Kehoe,* 310 F.3d 579, 591 (8th Cir.2002) ("Lee's statements to which Gloria testified are Kehoe's own because he had adopted them. He effectively was a witness against himself, thus Gloria's testimony did not violate his rights under the Confrontation Clause."), *cert. denied,* 538 U.S. 1048, 123 S.Ct. 2112, 155 L.Ed.2d 1089 (2003); *People v. Cruz,* 44 Cal.4th 636, 80 Cal.Rptr.3d 126, 187 P.3d 970, 999 (2008) ("it is well settled that an adoptive admission can be admitted into evidence without violating the Sixth Amendment right to confrontation on the ground that once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions* ") (citations and quotations omitted), *cert. denied,* —— U.S. ——, 129 S.Ct. 1531, 173 L.Ed.2d 661 (2009); *Globe v. State,* 877 So.2d 663, 672 (Fla.2004) ("admissions by acquiescence or silence do not implicate the Confrontation Clause").

 We agree with the analysis set forth in these cases. A statement admitted as a tacit admission is a statement that the defendant has adopted as his or her own. When such a statement is admitted into evidence, the "witness" against the defendant, therefore, is the defendant. Thus, there is no violation of the right to confront "the witnesses against him."

U.S. CONST. amend. VI. As the Court of Appeals has noted, a party "cannot be prejudiced by an inability to cross-examine him or herself." *Briggeman v. Albert,* 322 Md. 133, 135, 586 A.2d 15 (1991). Accordingly, admission of the statements made by Mr. Johnson, which were admitted as tacit admissions by appellant, did not violate appellant's right to confrontation.

## II.

### Fruit of the Poisonous Tree

When government officials obtain evidence in violation of the Fourth Amendment, the "[i]llegally obtained evidence is excluded under the exclusionary rule—a judicially imposed sanction," which serves to "deter lawless and unwarranted searches and seizures by law enforcement officers." *Myers v. State,* 395 Md. 261, 282, 909 A.2d 1048 (2006) (citing *Mapp v. Ohio,* 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). In this case, the circuit court held that the gun found in appellant's trunk was obtained by an illegal search, and it granted appellant's motion to suppress the gun.

The exclusionary rule also applies "to evidence that was the indirect product or 'fruit' of police conduct in violation of the fourth amendment." *Ferguson v. State,* 301 Md. 542, 548, 483 A.2d 1255 (1984) (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Appellant relies on this authority in support of his contention that the trial court erred in denying his motion to suppress his own statements made to Mr. West at central booking. He argues that his statement was the "fruit" of illegal police conduct, asserting that his arrest was based on the gun found pursuant to the illegal detention and search, and absent his "unlawful arrest, he would never have been in a position to talk to Michael West." He further posits that "there is every reason to believe that West was acting as a state agent" and "was working as an informant for the police."

The State argues that the motions court properly denied appellant's motion to suppress, asserting that appellant's sub-

sequent statement to Mr. West in central booking did not qualify as the fruit of an illegal arrest. It argues that appellant's statements to Mr. West were "not even remotely caused by" illegal conduct, noting that they were "separated from the arrest in both time and circumstance" and were "not instigated by the police or any other state actor." The State contends that, "whether it be based on attenuation or independent source, it was entirely proper for the motions court to conclude that Cox's admission to West was not a fruit of the asserted illegality." With respect to appellant's claim that appellant was a state actor, the State argues that appellant's failure to assert this argument below precludes him from advancing this argument on appeal.

In denying appellant's motion, the trial court stated:

I have reviewed *Gibson versus State*, 138 Md.App. 399 [771 A.2d 536 (2001),] and I, unfortunately I don't find [appellant's trial counsel] any support for the conclusion that but for the illegal detention and subsequent arrest of the Defendant he would not have been in the company of Mr. West at the central booking facility therefore his independent decision to make statements to Mr. West is covered by the fruit of the poisonous tree doctrine.

The Court finds first as a fact that Michael West is not a law enforcement officer and that this was not a statement given in any way that could be characterized to a law enforcement since he's nothing but a citizen himself detained at the central booking facility. Additionally, the Court finds as argued by the State that the but for test with respect to the fruit of the poisonous tree has specifically been denounced, not substantiated.

The *Gibson* case sets forth in documents that the but for test is simply not the test. . . .

In this case, the conversation between Michael West and the Defendant in no way intrudes on the Defendant's Fourth Amendment rights as the Court has found that Michael West is a private citizen. The Court further finds that as [the Prosecutor] argued the but for test is not the

applicable test and that in this case the decision to talk to Mr. West was an independent decision not related in any way to any illegal or unlawful contact by the Baltimore City Police Department and that this decision simply places Mr. Cox's statements to Mr. West outside of the ambit of the fruit of the poisonous tree doctrine.

When reviewing the circuit court's ruling denying a motion to suppress, we " 'consider only the facts and information contained in the record of the suppression hearing.' " *Smith v. State*, 414 Md. 357, 361, 995 A.2d 685 (2010) (quoting *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129 (2007)). We view the evidence adduced at the suppression hearing "and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion." *Williamson v. State*, 413 Md. 521, 531–32, 993 A.2d 626 (2010). This Court accepts the factual findings of the circuit court " 'unless clearly erroneous,' " but we conduct " 'our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case.' " *Smith*, 414 Md. at 361, 995 A.2d 685 (quoting *Prioleau v. State*, 411 Md. 629, 638, 984 A.2d 851 (2009)).

For evidence to be excluded under the "fruit of the poisonous tree" doctrine, "there must be a 'cause-and-effect' relationship or nexus between the 'poisonous tree and its alleged fruit.' " *Miles v. State*, 365 Md. 488, 520, 781 A.2d 787 (2001) (quoting *State v. Klingenstein*, 92 Md.App. 325, 360, 608 A.2d 792 (1992)), *cert. denied*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002). Evidence is not considered to be "fruit of the poisonous tree," however, merely because it would not have been discovered "but for the illegal actions of the police." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407. Rather, "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 488, 83 S.Ct. 407 (citation omitted). *Accord United States v. Ceccolini*, 435 U.S.

268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) ("we have declined to adopt a 'per se or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest") (quoting *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

To balance "the protections of the Fourth Amendment with the need for effective law enforcement," the Supreme Court has recognized three methods of purging the taint of original unlawful police conduct. *Miles*, 365 Md. at 520, 781 A.2d 787. *Accord Gibson*, 138 Md.App. at 403, 771 A.2d 536 ("It has come to be recognized that there are three ways of what has colorfully been described as 'unpoisoning the fruit.' "). The Court of Appeals has described these methods as follows:

> First, evidence obtained after initial unlawful governmental activity will be purged of its taint if it was inevitable that the police would have discovered the evidence. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984). Second, the taint will be purged upon a showing that the evidence was derived from an independent source. *See United States v. Wade*, 388 U.S. 218, 239–242, 87 S.Ct. 1926, 1938–1940, 18 L.Ed.2d 1149, 1164–1166 (1967). The third exception ... will allow the use of evidence where it can be shown that the so-called poison of the unlawful governmental conduct is so attenuated from the evidence as to purge any taint resulting from said conduct. *See Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

*Miles*, 365 Md. at 520–21, 781 A.2d 787.

 The State relies on the attenuation doctrine in support of its contention that appellant's statement is not the fruit of an illegal arrest.[14] As indicated, this doctrine recognizes "that it is possible that the challenged evidence can 'become so

---

14. Although the State mentions the independent source doctrine, the cases and analysis it presents address the attenuation doctrine.

attenuated as to dissipate the taint' " of the initial illegal activity. *Myers,* 395 Md. at 284, 909 A.2d 1048 (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)). The attenuation doctrine is a method to determine "whether there exists a strong enough causal connection between the primary taint and the challenged evidence to require the exclusion of that information." *Id.* at 286, 909 A.2d 1048.

In *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254, the Supreme Court set forth a three-part test to consider in an attenuation analysis. The factors include: "1) the proximity between the actual illegality and the evidence sought to be suppressed; 2) the presence of intervening factors; and 3) the flagrancy of the governmental misconduct involved in the case." *Miles,* 365 Md. at 522, 781 A.2d 787. No single factor is dispositive; rather, the court must balance the factors in the attenuation analysis. *Cox v. State,* 397 Md. 200, 219, 916 A.2d 311 (2007) (citing *Ferguson,* 301 Md. at 553, 483 A.2d 1255).

We begin our analysis with the first factor, "the proximity between the actual illegality and the evidence sought to be suppressed." *Miles,* 365 Md. at 522, 781 A.2d 787. There is no " 'mathematically precise test for determining at what point the taint has been purged by the lapse of time.' " *Id.* at 527, 781 A.2d 787 (quoting *Ferguson,* 301 Md. at 550, 483 A.2d 1255). This factor suggests, however, "that the greater the time lapse between the illegality and discovery of evidence, the greater the chance that the taint has been purged." *Cox,* 397 Md. at 218, 916 A.2d 311. In *Brown,* 422 U.S. at 604–05, 95 S.Ct. 2254, a confession made less than two hours after the unlawful arrest was found not to be sufficiently attenuated, and in *Ferguson,* 301 Md. at 550, 483 A.2d 1255, a twenty minute lapse between an illegal arrest and an extrajudicial identification was found to be an insufficient amount of time to purge the taint of the initial illegality.

Here, appellant's statements to Mr. West did not occur within minutes or hours after the illegal arrest. Rather, they

occurred the next day, after appellant had been removed from the scene of the traffic stop and taken to central booking.

In *United States v. Lopez–Garcia*, 565 F.3d 1306, 1315 (11th Cir.), *cert. denied,* —— U.S. ——, 130 S.Ct. 1012, 175 L.Ed.2d 620 (2009), the United States Court of Appeals for the Eleventh Circuit addressed a statement made the day after an alleged illegal arrest.[15] The court stated:

> To be sure, there is no hard-and-fast rule for determining how much time must have passed before the link between an unlawful arrest and a confession can be considered sufficiently attenuated. Nevertheless, we have said that [i]f only a short period of time has passed, a court is more likely to consider the consent as a "poisonous fruit" of the illegal act. Thus, we have observed that the amount of time found sufficient to meet the temporal proximity factor ranges from immediate or 'close in time,' to three minutes, to two hours.

*Id.* (citations and quotations omitted). Because Lopez–Garcia's statements "were not made until the day after the arrest," the court concluded that "his statements were too attenuated from his arrest to be regarded as fruit of the poisonous tree." *Id.*

Other courts similarly have found that a lapse of time of one day, or even less, between the "primary illegality" and a subsequent statement, is a sufficient lapse of time to dissipate the taint of the illegal conduct. *See State v. Blackman*, 246 Conn. 547, 716 A.2d 101, 106 (1998) (incriminating statements made approximately 14 hours after the motor vehicle stop "lacked temporal proximity to the allegedly illegal police action"); *State v. Serrato*, 424 So.2d 214, 218 (La.1982) (temporal proximity of the illegal arrest and the confession made more than 21 hours later "was fairly distant"); *State v. Belton*, 150 N.H. 741, 846 A.2d 526, 533 (24 hours between illegal detention and incriminating statements was a "significant period of time which reduces the possibility that the defendant's state-

---

**15.** The court ultimately concluded that the stop and arrest were constitutional. *United States v. Lopez–Garcia,* 565 F.3d 1306, 1315 (2009). The court, however, went on to address the attenuation factors. *Id.*

ments were the product of the illegal detention as opposed to his own free will"), *cert. denied,* 543 U.S. 1028, 125 S.Ct. 674, 160 L.Ed.2d 509 (2004).

Appellant's statements here were made approximately twenty hours after the illegal arrest. This lapse of time was long enough to support a finding that the statements were " 'sufficiently an act of free will to purge the primary taint.' " *Brown,* 422 U.S. at 602, 95 S.Ct. 2254 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407). Accordingly, the temporal proximity factor weighs in favor of a finding that the statement was sufficiently attenuated from the initial illegality that it need not be suppressed.

The second factor is the presence of intervening circumstances. The Court of Appeals has explained that " '[a]n intervening circumstance is an event that breaks the causal connection between the unlawful conduct and the derivative evidence.' " *Myers,* 395 Md. at 288, 909 A.2d 1048 (quoting *Ferguson,* 301 Md. at 551, 483 A.2d 1255).

The Court of Appeals stated that "the voluntariness of a person's actions in providing evidence or testimony should be considered as an intervening factor under the attenuation doctrine." *Miles,* 365 Md. at 525, 781 A.2d 787. Here, appellant's statements were made voluntarily to another inmate in jail.

Other courts have found that a statement made voluntarily to an inmate was a sufficient intervening factor to support a finding that the statement was not the fruit of an illegal arrest. *State v. Ostroski,* 201 Conn. 534, 518 A.2d 915, 922–23 (1986), is instructive. In that case, the Supreme Court of Connecticut considered whether Ostroski's confession to his friend, and fellow inmate, was the fruit of an illegal arrest. *Id.* The court weighed the three attenuation factors and found that there were "significant intervening events which substantially broke the causal connection between the illegal arrest and the defendant's admission," the most important of which was Ostroski's decision to voluntarily confess to his friend. *Id.* at 922. The court stated:

[T]he defendant's voluntary conduct in admitting the killing to his friend was not the product of police exploitation of any prior illegality but was a totally unexpected voluntary admission by the defendant. Allen was not an agent of the police, nor is there any claim that he was. Allen had been the defendant's friend for a period of time prior to this episode. Under the circumstances of this case, we cannot say that the admission to Allen was " 'come at by exploitation of [the] illegality.' "

*Id.* at 923 (citations omitted).

Similarly, in *United States v. Houle,* 620 F.2d 164, 165–66 (8th Cir.1980), the United States Court of Appeals for the Eighth Circuit addressed whether statements Houle made to his cellmates two hours after his arrest were "sufficiently an act of free will to purge the primary taint of the illegal arrest." In holding that the statements were admissible, the court noted that "Houle's statements were not prompted by coercion or interrogation and were voluntarily made under circumstances within Houle's control." *Id.* at 166.

Appellant's voluntary conduct here, in making statements about the crime to another inmate, were not prompted by the police, but instead were made during a casual conversation with another inmate.[16] The voluntariness of appellant's action constitutes an intervening factor that weighs in favor of attenuation.

---

16. On appeal, appellant argues that Mr. West was acting as a state agent during the conversation with appellant and Mr. Johnson. The State responds that this aspect of appellant's argument is unpreserved because this argument "was not advanced to the motions court below." We agree that this claim is unpreserved, and we therefore decline to address it on appeal. *See Collins v. State,* 192 Md.App. 192, 217, 993 A.2d 1175 (2010) (" '[T]he failure to argue a specific theory in support of a motion to suppress evidence constitutes waiver of that argument on appeal.' ") (citations omitted). Moreover, appellant's argument in support of his assertion, that "[i]t seems more than simply coincidental" that various circumstances existed, would not be sufficient for this Court to determine, on appeal, that Mr. West was working as an informant for the police.

The final factor is the purpose and flagrancy of the government misconduct. "This factor effectuates the deterrence policy of the exclusionary rule by providing an incentive for police to engage in lawful conduct." *Ferguson*, 301 Md. at 552, 483 A.2d 1255. Here, the police conduct was not flagrant. Nor did the detention and arrest have "a quality of purposefulness" that weighed in favor of exclusion of the subsequent statement. *Brown*, 422 U.S. at 605, 95 S.Ct. 2254. The purpose of the initial detention and arrest was not to obtain the statement that appellant subsequently made to Mr. West in central booking about a different crime. *See Ostroski*, 518 A.2d at 923 (purpose of continued detention was not "to acquire a totally unexpected, voluntary admission by the defendant to his friend Allen").

Weighing the three favors in the attenuation analysis leads to the conclusion that appellant's statements were sufficiently attenuated to dissipate the taint of the illegal detention and arrest. The statements, which were made the day after the arrest, were not the product of police exploitation of the illegal arrest. Rather, they were an unexpected voluntary admission during a conversation with another inmate in jail. The trial court properly denied appellant's motion to suppress his statements.

## III.

### Sufficiency of the Evidence

■■■ Appellant's final contention is that the evidence was insufficient to sustain his convictions. Specifically, he argues that, because Mr. West's testimony involved his direct and tacit admissions, his conviction can be upheld only if there was corroborating evidence. Appellant asserts, however, that "there was no evidence, but for Michael West's testimony, that [he] committed the crimes charged."

The State argues that the evidence was sufficient to support appellant's convictions. It maintains that appellant's extrajudicial confession was adequately corroborated.

When reviewing the sufficiency of the evidence, we must determine, after viewing the evidence in the light most favorable to the State, if " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Burlas v. State,* 185 Md.App. 559, 568, 971 A.2d 937 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), *cert. denied,* 410 Md. 166, 978 A.2d 245 (2009). If the evidence " 'showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt[,]' then we will affirm the conviction." *Bible v. State,* 411 Md. 138, 156, 982 A.2d 348 (2009) (quoting *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998)).

▮▮▮ The parties agree that " 'an extrajudicial confession of guilt by a person accused of crime, unsupported by other evidence, is not sufficient to warrant a conviction.' " *Woods v. State,* 315 Md. 591, 615–16, 556 A.2d 236 (1989) (quoting *Bradbury v. State,* 233 Md. 421, 424, 197 A.2d 126 (1964)). A defendant's confession must " 'be supported by evidence, independent of the confession, which relates to and tends to establish the *corpus delicti, i.e.,* the facts that are necessary to show that a crime has been committed.' " *Id.* (quoting *Bradbury,* 233 Md. at 424, 197 A.2d 126).

▮▮▮ The corroboration required, however, may be "small in amount," and it must show only the "major or essential harm involved in the charged offense." *Riggins v. State,* 155 Md.App. 181, 214, 215, 843 A.2d 115 (quotation and citation omitted), *cert. denied,* 381 Md. 676, 851 A.2d 595 (2004). The corroborating evidence need not " 'be full and complete' " or " 'establish the truth of the *corpus delicti* either beyond a reasonable doubt or by a preponderance of proof.' " *Miller v. State,* 380 Md. 1, 46, 843 A.2d 803 (2004) (citations omitted).

In *Woods,* the Court of Appeals noted that proof of the *corpus delicti* in a murder case, " 'is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circum-

stances which indicate that it was caused criminally by someone.'" 315 Md. at 617, 556 A.2d 236 (quoting *Jones v. State,* 188 Md. 263, 272, 52 A.2d 484 (1947)). *Accord Ballard v. State,* 333 Md. 567, 578, 636 A.2d 474 (1994) ("[I]n a homicide case, the *corpus delicti* consists of proof that the victim died and that the death was caused by a criminal act, but it need not tend to connect the defendant on trial with that act."); *Riggins,* 155 Md.App. at 211–12, 843 A.2d 115 (*"The corpus delicti* of the crime of murder is ordinarily established through the presence of the victim's body and by direct evidence establishing that death resulted from criminal activity.").

In *Woods,* 315 Md. at 617, 556 A.2d 236, the Court affirmed Woods' conviction for murder stating:

In his confession Woods admitted that he shot Michael Boyd "three or four times" at point blank range in consummation of a plan to kill Boyd. This admission was corroborated as required with respect to the corpus delicti of murder in the first degree. Evidence apart from the confession established that Michael Boyd was indeed dead. His body was found. A doctor in the Department of Post Mortem Examiners testified that the cause of death was "the gunshot wounds." [ ] The gunshot wounds were enough to show that the manner of death was homicide—that Boyd's death was not by accident or suicide but was caused criminally by someone. With this corroboration the confession was enough to meet the test for the sufficiency of evidence to sustain the conviction of murder in the first degree.

Here, there similarly was sufficient evidence to corroborate appellant's extrajudicial confession to Mr. West. Appellant's admissions regarding the murder were corroborated by evidence that the victim was dead, as well as by Dr. Vincenti's testimony that the cause of death was homicide. Moreover, the admission that Mr. Johnson used a gun, which was described as a "nine," was corroborated by the discovery of a 9–millimeter cartridge casing at the scene of the murder. The evidence was sufficient to support appellant's convictions.

664

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.